

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-13-00144-CR

Gerardo Gabriel **DE LA FUENTE**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 111th Judicial District Court, Webb County, Texas
Trial Court No. 2011-CRN-000962-D2
Honorable Monica Z. Notzon, Judge Presiding

Opinion by:     Rebeca C. Martinez, Justice

Sitting:        Sandee Bryan Marion, Justice
                Rebeca C. Martinez, Justice
                Luz Elena D. Chapa, Justice

Delivered and Filed:  April 2, 2014

AFFIRMED

Gerardo Gabriel "G.G." De La Fuente appeals his conviction for murder, challenging the

sufficiency of the evidence to corroborate accomplice witness testimony and to support his guilt

under the law of parties, in addition to other purported trial errors.  We overrule De La Fuente's

issues on appeal and affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

De La Fuente was charged with the murder of Agustin Tamayo.  In the early morning hours

of August 11, 2011, De La Fuente and Sabrina Rubio, a cocaine supplier for the "Ghost Town"

neighborhood of Laredo, were driving around making deliveries. At one point, they stopped and picked up Mario Alberto Garza. De La Fuente continued driving Rubio's black Chevy Impala; Rubio was riding in the front passenger seat, and Garza was in the backseat. At approximately 4:05 a.m., a phone call was made from one of Rubio's cell phones to Tamayo's house. De La Fuente then drove to Tamayo's house, a known "crack house" in the Ghost Town area. Tamayo walked out of his house and had a conversation with one of the people inside the black car. Garza fired four shots at Tamayo from the backseat of the car. After the shots were fired, De La Fuente drove away. Tamayo was shot in the heart and lungs and died at the scene. Garza, Rubio, and De La Fuente were all indicted for Tamayo's murder.

The evidence at De La Fuente's trial included accomplice witness Sabrina Rubio's testimony that De La Fuente was the driver of her black Chevy Impala that night and Garza was the shooter. The State granted Rubio testimonial immunity. Rubio testified she picked up De La Fuente about midnight and they drove around making her cocaine deliveries. Rubio had two cell phones with her that night—numbers ***2684 and ***1275. She stated De La Fuente was using the cell phone with the number ***2684 that night. De La Fuente called Mario Garza, whom Rubio did not know. De La Fuente was the one who decided to drive over and pick up Garza. Rubio testified that all three of them had used drugs and alcohol that night, and "not one of us was sober." Rubio testified that she was the one who used cell phone number ***2684 to call Tamayo's residence at about 3:00 a.m. or 4:00 a.m. Tamayo asked Rubio if she "had anything on [her]," and Rubio said she did. De La Fuente then drove the car over to Tamayo's house, with Rubio riding in the front passenger seat and Garza in the back seat. Tamayo met them outside and walked up to the driver's side window. Tamayo told De La Fuente he was waiting for a guy to bring him some money and De La Fuente replied they would come back later. Rubio stated that Tamayo always paid her and did not owe her money and that the conversation was friendly. Garza suddenly

fired four shots into Tamayo's chest from the backseat of the car; Garza did not say anything, he just shot. Rubio stated she turned around in her seat and asked Garza, "why . . . did you do that?" Rubio saw that the gun was a revolver. De La Fuente drove away at "medium" speed after Garza fired the shots, telling Rubio to "calm down."

Rubio testified that De La Fuente drove to her family ranch off of Highway 359. The ranch house was locked but they broke inside and she, De La Fuente, and Garza stayed there together for about seven or eight hours. Rubio testified that at the ranch house she overheard De La Fuente ask Garza, "why did you do that?" and say, "I never wanted you to do anything." Later, De La Fuente told Rubio that, "if anything happened that he would take the blame," and that "some things are meant to happen and some things just happen." De La Fuente also instructed Rubio to erase Tamayo's phone number. In her statement to Officer Richard Reyes, Rubio stated that De La Fuente also told her "if anything happens, you don't know nothing." Rubio testified she did not know why Garza shot Tamayo, and did not see Garza with a gun when he got into her car. She stated De La Fuente never told her anything about a plan to kill Tamayo that night. Rubio called her grandmother while they were at the ranch. Her grandmother drove to the ranch and Rubio gave her purse to her grandmother who took it home. Rubio stated her purse had a thousand dollars' worth of cocaine and money in it. The next morning Garza's brother picked the three of them up in a yellow Hummer. Rubio left her black Impala at the ranch and eventually gave it to her aunt in another city. Garza's brother drove them to the Garza home where the three of them stayed together another four or five hours. Eventually, Rubio asked Garza's mother to drive her home. No one ever called the police about Tamayo's murder.

In addition, Joey Salazar, who was inside Tamayo's house at the time of the shooting, testified he heard a car honk and Tamayo went outside. Salazar looked outside and saw a black car. He heard Tamayo arguing with someone immediately before he heard three to five gun shots.

When Salazar came out he saw the black car driving away and found Tamayo on the ground dead. Veronica "Betty" Ramos testified that Rubio called her between 2:30 a.m. and 3:00 a.m. on the night of Tamayo's murder. Ramos could see that Rubio and De La Fuente were together in the car because De La Fuente took the phone away from Rubio and told Ramos to open the gate and let them in. Ramos refused. Ramos also testified that both Rubio and De La Fuente had told her they were dating.

Orlando Ibarra testified that, two weeks before Tamayo's murder, De La Fuente asked him for a gun but Ibarra did not have a gun at the time. Ibarra also testified that, two weeks after Tamayo's murder, he saw De La Fuente and they talked about the murder, with De La Fuente asking him, "What you know?"[1] Specifically, Ibarra testified that, "it came up again, just to talk about the murder, just talk about it, hey, you know, talk about neighborhood stuff. Did you know anything about him? Well no. Only what you know. Like what do you know? What do you know? And well, you know, that's the way I took it, what you know." When asked what De La Fuente's mannerisms and demeanor were like, Ibarra said, "Well, the way he is, the way we all carry ourselves. What, you know - - I guess I just took it as what you know. What do you know? That's what he said." In addition, Rubio's grandmother testified that Rubio was at the ranch house with two men that night and that they broke the locks to get inside. Garza's mother testified that Rubio and De La Fuente were with her son at her home the next day.

Detective Robert Garcia testified about his analysis of cell phone tower records for the night of Tamayo's murder. The records for cell phone number ***2684, which is registered to Sabrina Rubio, showed that a call was placed to Tamayo's residence at 4:05 a.m.; another call was made from that phone at 4:14 a.m. The records show the phone was physically located close to

---

[1] In its brief, the State incorrectly paraphrases De La Fuente's statement to Ibarra as "you know . . . what you know."

Tamayo's house at the time of those calls. The time of the 911 call from Tamayo's residence was 4:16 a.m., according to the lead investigator Richard Reyes. The phone records from later that day show Rubio's cell phone number ***2684 was near Highway 359, where Rubio's family ranch is located. The records also show, however, that the phone did not stay in one place, but was continuously moving into different cell phone tower areas during the day. Garcia testified the times shown on the cell phone tower records are not exact with respect to the time a call was placed, but reflect when the data was received.

Officer Richard Reyes testified concerning his investigation of Tamayo's murder and his interview of De La Fuente. The video recording of De La Fuente's statement was admitted into evidence and played for the jury. A written transcript with translations from Spanish to English was also admitted. In response to questions asking what he knew about Tamayo's murder, De La Fuente stated he heard a black car was involved but he denied knowing why or how Tamayo was killed. De La Fuente stated that he used drugs at Tamayo's house at about 8:00 p.m. that night and "was really high on drugs." De La Fuente insisted that Tamayo was a very good friend. De La Fuente admitted that he was driving Rubio's black Impala as they cruised around later that night. He stated that Rubio was a drug supplier and a friend with whom he hung out two to three times per week, but stated she was not his girlfriend. He also admitted that he sometimes used Rubio's cell phone. De La Fuente admitted that he drove Rubio's car to Tamayo's house. De La Fuente stated that Tamayo came out of the house, he spoke to Tamayo but did not get out of the car, and then he and Rubio drove away. De La Fuente was evasive, however, about whether he was the person who used Rubio's cell phone to call Tamayo's residence at 4:05 a.m. De La Fuente explained that after they stopped by Tamayo's house at about 4:00 a.m., he and Rubio drove to her grandfather's ranch off of Highway 359, but it was locked so they left. He and Rubio parted ways

and he returned to Laredo at about 6:45 a.m. in a different vehicle with a friend that he refused to name.

The jury was instructed to find De La Fuente guilty of murder if they found that, either acting alone or as a party with Mario Alberto Garza, he intentionally or knowingly caused Tamayo's death by shooting him in his body with a firearm. No lesser included offense instruction was given. The jury found De La Fuente guilty of murder. De La Fuente pled true to the State's punishment enhancements based on his prior felony convictions, which raised the punishment range to 15 years to life. Based on the jury's punishment recommendation, the trial court sentenced De La Fuente to 20 years' imprisonment. De La Fuente now appeals.

### ACCOMPLICE WITNESS — CORROBORATION

In his first issue, De La Fuente challenges the sufficiency of the evidence to corroborate Rubio's accomplice witness testimony as well as the sufficiency of the evidence to support his conviction as a party to the offense. We address the accomplice issue first.

The jury was properly instructed that Sabrina Rubio was an accomplice witness, and that it could not convict De La Fuente on the basis of her testimony, even if found to be credible, unless the testimony was corroborated by other evidence tending to connect De La Fuente with commission of the murder. *See Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) (an accomplice is a person who participated with the defendant before, during, or after the commission of the crime and acted with the required culpable mental state); *see also Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004) (an accomplice as a matter of law is a person susceptible to prosecution for the offense with which the defendant is charged or a lesser included offense). Under article 38.14 of the Code of Criminal Procedure, a conviction cannot be upheld on the basis of accomplice testimony unless it is corroborated by "other evidence tending to connect the defendant with the offense committed." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005).

The corroborating evidence need not be sufficient by itself to establish guilt, and need not directly link the defendant to commission of the offense. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008); *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999).

In reviewing the sufficiency of the corroborating evidence in the record, we exclude the accomplice testimony from our consideration and focus on the remainder of the record to determine whether there is any independent evidence that tends to connect the defendant with the commission of the crime. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); *Cathey*, 992 S.W.2d at 462-63. We view the independent evidence in the light most favorable to the jury's verdict. *Brown*, 270 S.W.3d at 567. The corroborating evidence may be direct or circumstantial, and is sufficient if the combined weight of the non-accomplice evidence tends to connect the defendant to the offense. *Solomon*, 49 S.W.3d at 361; *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991). While a defendant's mere presence at the scene of the crime is, by itself, insufficient corroboration, the defendant's presence combined with other suspicious circumstances may be sufficient to tend to connect the defendant to the crime. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996); *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992). Likewise, evidence that the defendant was in the presence of an accomplice at or near the time or place of the crime is proper corroborating evidence. *McDuff v. State*, 939 S.W.2d 607, 612 (Tex. Crim. App. 1997).

Here, the record contains sufficient non-accomplice evidence independently tending to connect De La Fuente with the commission of Tamayo's murder. In De La Fuente's own statement he admits (1) driving a black car (2) to Tamayo's house (3) at about 4:00 a.m., the approximate time of Tamayo's murder, (4) in the company of Sabrina Rubio, a person charged as an accomplice to the murder. De La Fuente also stated that Tamayo walked out of the house, and he spoke to Tamayo from the car before driving away. De La Fuente's admissions match Joey Salazar's

- 7 -

testimony that Tamayo walked out of the house after a car honked, he looked out and saw a car parked out front, he heard Tamayo speaking with someone, and he saw a black car driving away immediately after he heard the gunshots and found Tamayo dead. Other evidence showed the 911 call was made at 4:16 a.m. In addition, De La Fuente also admitted he used one of Rubio's cell phones. The cell phone records showed that one of Rubio's cell phones was used to call Tamayo's residence at 4:05 a.m., and the phone was located close to Tamayo's residence at the time of the call. Thus, the non-accomplice evidence places De La Fuente at or near the scene of Tamayo's murder and close in time to its commission. *See Smith v. State*, 392 S.W.3d 190, 195 (Tex. App.—San Antonio 2012, pet. ref'd) (non-accomplice testimony that places the defendant at or near the scene of the crime near the time of its commission is a factor that tends to connect the defendant to the crime and can corroborate an accomplice's testimony) (citing *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984)).

*Conclusion.* Considering the combined weight of the non-accomplice evidence detailed above, we conclude it sufficiently tends to connect De La Fuente to the commission of Tamayo's murder, and corroborates the accomplice testimony given by Rubio. *See Brown*, 270 S.W.3d at 567 (corroborating evidence need not directly link defendant to commission of the crime and need not be sufficient by itself to establish his guilt); *see also Cathey*, 992 S.W.2d at 462 (same).

SUFFICIENCY OF THE EVIDENCE — PARTY LIABILITY

De La Fuente also challenges the sufficiency of the evidence to establish his liability as a party for Tamayo's murder. In his brief, De La Fuente argues there is no evidence he knew Garza had a gun and that Garza was going to shoot Tamayo, or that he aided, assisted, or encouraged Garza to do so. Because we have concluded there is sufficient independent evidence linking De La Fuente to the commission of the murder to corroborate Rubio's testimony, we may consider her accomplice testimony in our sufficiency review.

In reviewing legal sufficiency, we consider all the evidence, both direct and circumstantial, in the light most favorable to the verdict to determine whether any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). It is the jury's role to resolve conflicts in the testimony, assess credibility and weigh the evidence, and draw reasonable inferences from the basic facts to the ultimate facts. *Brooks*, 323 S.W.3d at 899. In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony. *Id.* The appellate court may not substitute its own judgment for that of the jury. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Further, we must resolve any inconsistencies in the evidence in favor of the jury's verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

As applied to this case, the offense of murder is committed when a person intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). The jury was instructed that it could convict De La Fuente of murder under the law of parties. A person may be convicted as a party if the offense is committed by the conduct of another for which he is criminally responsible. TEX. PENAL CODE ANN. § 7.01(a) (West 2011). A person is criminally responsible for the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. . . ." *Id.* § 7.02(a)(2) (West 2011). Mere presence of a person at the scene of a crime either before, during or after the offense, or even flight from the scene, without more, is insufficient to sustain a conviction as a party to the offense; however, combined with other incriminating evidence it may be sufficient to sustain a conviction. *Thompson v. State*, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985). In determining whether a defendant participated as a party in the commission of an offense, the jury may consider events that occurred before, during or after

the offense, and may rely on acts that show an understanding and common design. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996) (opin. on reh'g); *Barnes v. State*, 56 S.W.3d 221, 238 (Tex. App.—Forth Worth 2001, pet. ref'd) (agreement to act together in a common design is seldom proven by direct evidence, but by circumstantial evidence).

Viewing the non-accomplice evidence along with Rubio's testimony in the light most favorable to the verdict, the evidence showed that De La Fuente was present at the time Garza shot and killed Tamayo, and that De La Fuente was the driver of the black car before and during the murder, as well as during their flight after the murder. His actions as the driver of the car aided in the commission of the murder. Further, the jury could have believed that De La Fuente was the person who called Tamayo to come outside before he was shot. In addition, there was other evidence from which the jury could infer De La Fuente's intent to aid in the commission of Tamayo's murder — De La Fuente tried to obtain a gun two weeks before; he was the person who knew Garza and decided to call and pick him up before driving to Tamayo's house that night; after Garza fired the shots from the car, De La Fuente did not help his friend Tamayo or call for an ambulance; instead, he drove away at a "medium" speed immediately after Garza shot Tamayo and told Rubio to calm down; he drove to Rubio's rural ranch where the three of them stayed together for several hours; then, in a different vehicle, De La Fuente went with Garza and Rubio to Garza's house where they again stayed together for several more hours. Both Rubio's grandmother and Garza's mother saw the three together during the period immediately after the murder. Thus, De La Fuente was in the company of the two accomplices, Rubio and Garza, before, during, and after the murder. In addition, according to Rubio, right after the murder De La Fuente instructed her to erase Tamayo's phone number from her phone and told her that he would take the blame, some things are meant to happen and some just happen, and "you don't know nothing."

The jury was entitled to resolve conflicts in the evidence and could choose to believe or disbelieve all or part of the testimony of any witness, including Rubio. *Brooks*, 323 S.W.3d at 899.

*Conclusion.* Viewing the evidence in the light most favorable to the verdict, we conclude the evidence is legally sufficient to support the jury's finding that De La Fuente aided Garza in a common plan to murder Tamayo and is therefore guilty of murder under the law of parties. TEX. PENAL CODE ANN. §§ 7.01(a), 7.02(a)(2).

### CONFRONTATION RIGHTS AND PROSECUTORIAL MISCONDUCT

In his second issue, De La Fuente asserts the trial court erred in denying his motion for mistrial based on a testimonial hearsay statement made by Officer Reyes in violation of the Sixth Amendment's Confrontation Clause. U.S. CONST. amends. VI, XIV. Specifically, De La Fuente complains about Reyes's testimony that during his investigation he learned that De La Fuente had been "boasting" about Tamayo's murder. In his third issue, De La Fuente argues the prosecutor engaged in willful misconduct by including a reference to Reyes's excluded testimony in the State's closing power point presentation.

### *Motion for Mistrial — Confrontation Clause Violation*

With respect to the denial of his motion for mistrial, De La Fuente complains that, in response to the prosecutor asking him what he learned next in his investigation, Officer Reyes stated that he learned De La Fuente "had been boasting about committing the shooting." De La Fuente objected that Reyes's statement was testimonial and violated his confrontation rights, and moved for a mistrial. The trial court denied the mistrial, but sustained De La Fuente's objection and instructed the jury to disregard Reyes's statement. De La Fuente argues on appeal that the "boasting" statement was so egregious that the only way to remedy the prejudice was to grant a mistrial.

A prompt instruction to disregard will ordinarily cure any error associated with an improper question and answer. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) (per curiam). We must presume the jury followed the trial court's instruction to disregard the evidence. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009). A mistrial is required only in "extreme circumstances, where the prejudice is incurable." *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). We review a trial court's denial of a motion for mistrial for an abuse of discretion, which occurs when a decision is outside the zone of reasonable disagreement. *Id.*

Here, assuming Reyes's testimony was improper, any error was cured by the trial court's instruction to disregard. The objectionable testimony was one brief statement, to which the court sustained De La Fuente's objection and promptly instructed the jury to disregard. Nothing in the record suggests the jury was unable to follow the instruction. *See Gamboa*, 296 S.W.3d at 581. The record does not present such an emotionally inflammatory or extreme circumstance that the rare remedy of a mistrial would be necessary to cure any prejudice. *See Young v. State*, 137 S.W.3d 65, 71 (Tex. Crim. App. 2004) (mistrial is reserved for rare circumstances where objectionable action is "so emotionally inflammatory" that curative instruction is unlikely to prevent jury from being unfairly prejudiced against defendant); *see also Orellana v. State*, 381 S.W.3d 645, 657 (Tex. App.—San Antonio 2012, pet. ref'd) (mistrial is extreme remedy that should be granted only when prejudice remains even after less drastic measures such as a curative instruction). We conclude the court did not abuse its discretion in denying De La Fuente's motion for mistrial.

### *Prosecutorial Misconduct – Closing Argument*

With respect to De La Fuente's assertion of prosecutorial misconduct, he complains that the prosecutor engaged in willful misconduct by including a reference to De La Fuente "bragging" about Tamayo's murder in the State's closing argument power point. De La Fuente contends this "bragging" evidence was a reference to Officer Reyes's excluded testimony and therefore the State

injected "new facts" outside the evidence. The four categories of proper jury argument are (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) responsive arguments, and (4) pleas for law enforcement. *Gallo v. State*, 239 S.W.3d 757, 767 (Tex. Crim. App. 2007). Reversible error occurs if the prosecutor's closing argument "injects new facts, harmful to the accused, into the trial." *Perez v. State*, 352 S.W.3d 751, 760 (Tex. App.—San Antonio 2011, no pet.).

Shortly after the State began its closing argument, De La Fuente objected to one of the State's power point slides that contained a reference to De La Fuente "bragging," arguing it was a reference to Reyes's excluded testimony. The prosecutor replied it was a reference to Ibarra's testimony that De La Fuente told him, "what you know," not a reference to Reyes's statement. The trial court denied De La Fuente's objection, but the State agreed to delete that line from the power point slide. In addition, even though the court denied De La Fuente's objection and motion for mistrial, it instructed the jury that what the attorneys say during closing is just "argument and summation of the evidence that they think, or they believe, was presented to you," and that "the evidence is what you heard in court from the witnesses and from the documents and other physical evidence before you." Even assuming the reference was not a proper summation of or deduction from the evidence, we believe the court's instruction to the jury was sufficient to cure any error in the jury's brief viewing of the statement. *See Gallo*, 239 S.W.3d at 767 (in evaluating harm from improper jury argument, court considers the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction)); *see also Archie*, 221 S.W.3d at 700. Thus, any error was harmless.

### JURY INSTRUCTION — VOLUNTARINESS OF STATEMENT

De La Fuente argues in his fourth and fifth issues that he was entitled to a requested jury instruction pertaining to the voluntariness of his recorded statement, and that he was harmed by the court's refusal to include it in the jury charge. *See* TEX. CODE CRIM. PROC. ANN. arts. 38.22, 38.23 (West Supp. 2013 & 2005). The State argues De La Fuente did not raise the voluntariness of his statement as an issue before the jury and was thus not entitled to the instruction.

De La Fuente filed a pre-trial motion to suppress his statement, asserting he did not voluntarily waive his *Miranda*[2] right to an attorney. The motion was denied, and the trial court made a finding that he voluntarily waived his *Miranda* rights. As noted, supra, the DVD and transcript of De La Fuente's statement were subsequently admitted at trial. De La Fuente argues on appeal that the DVD *itself* raised a disputed fact issue as to whether he voluntarily waived his *Miranda* rights. He specifically points to a comment he made after Reyes read him his *Miranda* rights and asked whether De La Fuente understood his rights and was voluntarily waiving those rights. De La Fuente responds that he understands his rights and is voluntarily waiving them. He then says, "An attorney ends up being costly." De La Fuente argues on appeal that this comment suggests that he did not, in fact, understand that he could have an attorney appointed if he was unable to hire one. He asserts that he was therefore entitled to an instruction under sections 6 and 7 of article 38.22 and article 38.23 as to the voluntariness of his statement.

Section 6 of article 38.22 provides that when, outside the jury's presence, the trial court has made a finding as a matter of law and fact that the statement was voluntarily made, as occurred here, evidence pertaining to voluntariness may still be presented to the jury. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6. When the issue of voluntariness is raised by the evidence, the trial

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

judge must instruct the jury that unless it believes beyond a reasonable doubt that the statement was voluntarily made, it must not consider it for any purpose. *Id.* art. 38.22, § 6. When a defendant's statement was the result of custodial interrogation, he is also entitled to an instruction under section 7 of article 38.22 if the trial evidence raises the issue of whether he was adequately warned of his rights and knowingly and intelligently waived his rights. *Id.* art. 38.22, § 7; *see Oursbourn v. State*, 259 S.W.3d 159, 175-76 (Tex. Crim. App. 2008).

Article 38.23 provides that no evidence obtained in violation of the law may be admitted in evidence against a criminal defendant. TEX. CODE CRIM. PROC. ANN. art. 38.23(a). That statute further states that "where legal evidence raises an issue hereunder," the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained illegally then it shall disregard such evidence. *Id.* To be entitled to an article 38.23 instruction, three predicates must be met: (1) the evidence heard by the jury must raise an issue of fact; (2) the evidence on that fact must be affirmatively contested; and (3) the contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the statement claimed to be involuntary. *Oursbourn*, 259 S.W.3d at 177; *Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012). The jury instruction is required only if there is a genuine dispute about a material fact. *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007). "The defendant must offer evidence that, if credited, would create a reasonable doubt as to a specific factual matter essential to the voluntariness of the statement. This factual dispute can be raised only by affirmative evidence, not by mere cross-examination questions or argument." *Oursbourn*, 259 S.W.3d at 177.

Here, the record does not show that De La Fuente offered any affirmative evidence raising a fact issue as to whether he understood his right to an appointed attorney. *See id.* at 174 (noting that regardless of which type of voluntariness instruction a defendant is seeking, the trial evidence must first raise a genuine factual dispute regarding "voluntariness"). On the DVD and transcript,

he affirmatively acknowledges understanding his *Miranda* rights and states that he is voluntarily waiving them. De La Fuente did not testify at trial. There was no evidence presented to the jury affirmatively contesting the voluntariness of De La Fuente's waiver of his right to an appointed attorney. De La Fuente's off-hand comment that a lawyer is expensive, when viewed within the context of his acknowledgment and waiver of his *Miranda* rights, does not constitute affirmative evidence raising a voluntariness issue. Therefore, the court did not err in denying the requested jury instruction.

**PUBLIC TRIAL – VOIR DIRE**

Finally, in his sixth and seventh issues, De La Fuente asserts the courtroom was closed to the public during voir dire in violation of his federal and state constitutional rights. De La Fuente asserts that his family and friends were removed from the courtroom prior to the seating of the venire panel and were not permitted to re-enter until after the jury was selected. The State argues the issue is waived because De La Fuente's attorney did not bring the matter to the trial court's attention at the time so it could be addressed, and first raised it in a motion for new trial filed two weeks after trial.

*Applicable Law*

An accused has a right to a public trial under the federal and state constitutions, as well as under the Texas Code of Criminal Procedure. U.S. CONST., amend. VI; TEX. CONST., art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.24 (West 2005). The state and federal rights are co-extensive. *Brandley v. State*, 691 S.W.2d 699, 708 n.3 (Tex. Crim. App. 1985); *Andrade v. State*, 246 S.W.3d 217, 224 n.5 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). The public trial right extends to the jury selection phase, including voir dire. *Presley v. Georgia*, 558 U.S. 209, 212-13 (2010) (per curiam); *Steadman v. State*, 360 S.W.3d 499, 510-11 (Tex. Crim. App. 2012). In determining whether any portion of a trial was closed to the public, we look at "the totality of the evidence and

determine whether the trial court fulfilled its obligation 'to take every reasonable measure to accommodate public attendance'. . . ." *Lilly v. State*, 365 S.W.3d 321, 331 (Tex. Crim. App. 2012) (quoting *Presley*, 558 U.S. at 215); *see also Cameron v. State*, 415 S.W.3d 404, 409-10 (Tex. App.—San Antonio 2013, pet. granted) (holding the *Lilly* analysis is not a sequential two-step process, but rather one broad inquiry).

### *The Voir Dire Record*

The transcript of the voir dire proceedings reflects that prior to the seating of the venire panel, the following exchange occurred:

> DEFENSE COUNSEL:   Oh, Your Honor, there is one thing.  My client's family were asked to leave the courtroom, outside of the courtroom.  And this is on the record, outside the courtroom are the following individuals:  Gabriel De La Fuente, Eva De La Fuente, those are my client's parents, Janet Ortega the sister, Emilio Ortega the brother, Jose Ortega the nephew, Claudia Benavides the wife, Lilibeth Benavides the sister-in-law, and Jose Luis Degollado the uncle.  And they were asked to leave the courtroom, and we believe that they should be allowed in.  This should be an open and public voir dire.  And that this should be an open and public voir dire as to the 6th amendment to the United States Constitution and - -
>
> THE COURT:   Why were they asked to leave?
>
> THE BAILIFF:   Your Honor, the reason being is that it's an 80-panel, and there's no room for anybody else, not enough chairs for the Jury panel.  They were not asked to leave.
>
> THE COURT:   All right.  They can stand in the back if there isn't any room to sit, but anybody who needs to come in can come in.
>
> DEFENSE COUNSEL:   Then I'll let them know that once the panel walks in that they can.
>
> THE COURT:   All right.  So, that the record is clear, they were just asked to leave for a few minutes so we can get the panel in here.  All right.  So, they can come in.
>
> DEFENSE COUNSEL:   All right.

The trial record contains no further objection or reference to the exclusion of De La Fuente's family or the public from the courtroom.

*The Motion for New Trial Record*

Two weeks after trial, De La Fuente raised the public trial issue in a motion for new trial. At a hearing on the motion for new trial, several of De La Fuente's family members testified that the bailiff, Deputy Quintana, refused their repeated requests to re-enter the courtroom during jury selection. Specifically, De La Fuente's mother and father testified that defense counsel came out to the hall and told them the judge said it was alright for them to come back into the courtroom as soon as the panel was seated. However, despite their repeated requests to re-enter the courtroom to watch jury selection, Deputy Quintana refused to allow them to enter the courtroom until after the jury was selected. They did not tell defense counsel about it that day because they thought it was the court's rule or the judge changed her mind. They first informed defense counsel that they were excluded during voir dire two weeks after trial. Six other family members gave similar testimony.

Deputy Quintana testified at the motion for new trial hearing that the judge instructed him to "escort everybody who was in the courtroom so that the panel could come inside." There were 70 or more panel members and the Fire Code provides the maximum number of people that can be inside the courtroom are those that can be seated. After the panel was seated, it was crowded and there were no more seats. In fact, he had to bring in seats for the panel from other courtrooms. Quintana stated he did not recall the judge instructing him to let people in to stand up during jury selection. He further stated, "there was no space for anybody to stand in the back" after the panel was seated. Quintana testified he did not deny access or exclude anyone from the courtroom, and that no one asked to come in after the panel was seated.

At the conclusion of the hearing, the trial court reserved ruling on the motion for new trial until it could review the transcript of the voir dire proceedings. However, the trial judge expressed her recollection of that day on the record as, "if memory serves me correct, the entire courtroom

was needed for the panel to come in. I think we even had a whole additional set of seats lined along the back wall." The judge recalled there were family members of the defendant and the victim as well as witnesses in the courtroom and, "I asked that everybody clear the benches and the chairs so that the panel could be seated. And then, when that was done, I said, 'whatever they can find in terms of standing room in the back, that's where they can stand' . . . But it wasn't that they couldn't come in and watch. It was just that they couldn't sit down because they needed the seats for the jury panel."

*Analysis*

Unlike in *Cameron* where the record contained a lengthy discussion between the trial judge and counsel concerning the public's exclusion during voir dire, along with the trial judge's written findings on the issue, here the record indicates the courtroom was not closed to the public during voir dire. *See Cameron*, 415 S.W.3d at 406-08. As set forth above, at the beginning of the voir dire phase, the judge twice affirmatively instructed that De La Fuente's family "can come in" after the seating of the venire panel. The record does not show the trial judge was ever informed that, subsequent to her instruction, her bailiff purportedly refused entry to De La Fuente's family during jury selection. The first notice to the trial court of the family's exclusion occurred two weeks after trial. The trial judge was therefore deprived of the opportunity, at the time of the exclusion, to take further steps to accommodate the family inside the courtroom and to make any necessary findings on the record. *See Lilly*, 365 S.W.3d at 331; *Steadman*, 360 S.W.3d at 506-08. Considering the totality of the evidence, we conclude the trial court did not close the courtroom to the public during voir dire. *See Lilly*, 365 S.W.3d at 331.

## CONCLUSION

Based on the foregoing reasons, we overrule all of De La Fuente's appellate issues and affirm the judgment of the trial court.

Rebeca C. Martinez, Justice

PUBLISH