ACCEPTED
04-14-00717-CR
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
3/9/2015 4:16:22 PM
KEITH HOTTLE
CLERK

# IN THE FOURTH COURT OF APPEALS
## SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
3/9/2015 4:16:22 PM
KEITH E. HOTTLE
Clerk

## COURT OF APPEALS NO. : 04-14-00717-CR
*(Companion Case to No. 04-14-00716-CR)*

## TRIAL COURT CASE NO. : 2014CRM000389 D2

### ALFONSO CARLOS TAMEZ
### A/K/A "PELÓN"
#### APPELLANT

## V.

### THE STATE OF TEXAS,
#### APPELLEE

## STATE'S BRIEF

**ISIDRO R. ALANIZ**
**DISTRICT ATTORNEY**
**49TH JUDICIAL DISTRICT**

**By: David L. Reuthinger, Jr.**
**Assistant District Attorney**
**Webb County, Texas**
**1110 Victoria St., Ste. 401**
**Laredo, Texas 78040**
**(956) 523-4900**
**(956) 523-5070 (Fax)**
**Bar No. 24053936**
ATTORNEY FOR THE STATE

## IDENTITY OF PARTIES AND COUNSEL

**APPELLANT:**

ALFONSO CARLOS TAMEZ
A/K/A "PELÓN"

Represented by:
NATHAN HENRY CHU
5517 McPherson Rd., Ste 14
Laredo, Texas 78041
(956) 728-7474
(888) 360-8591 (Fax)

**STATE:**

THE STATE OF TEXAS

Represented by:
ISIDRO R. ALANIZ
District Attorney, 49th Judicial District
By: David L. Reuthinger, Jr., Assistant District Attorney
Webb County Justice Center, 4th Floor
1110 Victoria St., Suite 401
Laredo, Texas 78040
(956) 523-4951
(956) 523-5070 (Fax)
dreuthinger@webbcountytx.gov

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ................................................. 2

TABLE OF AUTHORITIES ................................................................. 5

STATEMENT REGARDING ORAL ARGUMENT ................................. 8

STATEMENT OF FACTS .................................................................... 9
    A. The Wounded Warrior ........................................................... 9
    B. Leticia's Intuition .................................................................. 17
    C. Pelón Tamez's Hummer ......................................................... 23
    D. The Plot Thickens ................................................................. 26
    E. "We Cleaned Up" .................................................................. 30

GENERAL SUMMARY OF THE ARGUMENT .................................... 36

ISSUES PRESENTED ........................................................................ 38
  RESPONSE TO POINT OF ERROR NO. 1 (Speedy Trial): ................ 38
    STATEMENT OF FACTS ............................................................ 38
    SUMMARY OF THE ARGUMENT ............................................... 41
    ARGUMENT AND AUTHORITY .................................................. 42
      A. Standard of Review ............................................................ 42
      B. The *Barker* Four-Factor Test ............................................ 44
      C. Application of the *Barker* Factors .................................... 48
      D. Appellant Was Not Entitled to a Severance Even Had One Been Requested ........................................................................... 53
  RESPONSE TO POINT OF ERROR NO. 2 (Sufficiency): ................. 54
    SUMMARY OF THE ARGUMENT ............................................... 54
    ARGUMENT AND AUTHORITY .................................................. 54
      A. Standard of Review ............................................................ 54
      B. Elements of the Offenses .................................................... 56
      C. Application: Principal Liability .......................................... 59
      D. Application: Party Liability ................................................ 60
  RESPONSE TO POINT OF ERROR NO. 3 (Jury Charge Error): ......... 63
    SUMMARY OF THE ARGUMENT ............................................... 63
    ARGUMENT AND AUTHORITY .................................................. 64
      A. Rule: Jury Charges Do Not Contain Statements of Fact ..... 64
      B. Application: Appellant Improperly Wanted Facts in the Charge 66
      C. Arguendo Harm Analysis .................................................... 67

RESPONSE TO POINT OF ERROR NO. 4 (Hearsay): .........................73
    SUMMARY OF THE ARGUMENT ......................................................73
    ARGUMENT AND AUTHORITY......................................................73
    A. Standard of Review .......................................................................73
    B. Application .....................................................................................74
    C. Arguendo Harm Analysis ..............................................................76

PRAYER......................................................................................................79

CERTIFICATE OF COMPLIANCE...........................................................80

CERTIFICATE OF SERVICE ....................................................................80

# TABLE OF AUTHORITIES

**Cases**

*Barringer v. State*, 399 S.W.3d 593 (Tex. App.—Eastland 2013).......38, 44

*Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)*....64, 67, 68

*Barker v. Wingo*, 407 U.S. 514, 530 (1972) ...................................42, 45, 46

*Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010) (plurality opinion)................................................................................54, 55, 59

*Cano v. State*, 369 S.W.3d 532, 534 (Tex. App.—Amarillo 2012) ...........45

*Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992).......46, 49, 74

*Coffin v. State*, 885 S.W.2d 140, 149 (Tex .Crim. App. 1994) ..................73

*De la Fuente v. State*, 432 S.W.3d 415, 423 (Tex. App. San Antonio 2014) ....................................................................................58, 59, 62

*Dillingham v. U.S.*, 423 U.S. 64, 65 (1975)................................................49

*Dorsey v. State*, 24 S.W.3d 921, 924 (Tex. App—Beaumont 2000, pet. ref'd)................................................................................56, 59

*Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003).......42, 44, 50

*Druery v. State*, 225 S.W.3d 491, 505–06 (Tex. Crim. App. 2007)...........69

*Dunne v. State*, 263 S.W. 608, 616 (Tex. Crim. App. 1923).......................64

*Gordon v. State*, 714 S.W.2d 76, 77 (Tex. App.—San Antonio 1986, no pet.)   63, 66, 70

*Grayless v. State*, 567 S.W.2d 216, 221 (Tex. Crim. App. 1978) ..............48

*Gullatt v. State,* 368 S.W.3d 559, 571-72 (Tex. Crim. App. 2011)............46

*Guzman v. State*, 855 S.W.2d 85 (Tex. Crim. App. 1997) .........................43

*Hinojosa v. State*, 433 S.W.3d 742, 752 (Tex. App.—San Antonio 2014, pet. refused) ...............................................................................55, 57, 58

*Ingram v. State*, No. 04-09-00249-CR, 2010 WL 1609696, *3-4 (Tex. App.—San Antonio April 21, 2010) (not designated for publication) ..44, 45

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) .........................................55

*Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001) .........................77

*Johnson v. State*, 954 S.W.2d 770, 771 (Tex. Crim. App. 1997) ...............43

*Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) ...................55

*King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000).................55, 61

*Lane v. State*, 151 S.W.3d 188, 191-92 (Tex. Crim. App. 2004)...............55

*Lester v. State*, 120 S.W.3d 897, 902-03 (Tex. App.—Texarkana 2003) .76, 77

*Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App.1997) .....................57

*Marvis v. State*, 36 S.W.3d 878, 880 (Tex. Crim. App. 2001) ....................70

*McCarty v. State*, 498 S.W.2d 212, 216 (Tex. Crim. App. 1973) ........47, 50

*Mendoza v. State*, 61 S.W.3d 498, 505 (Tex. App.—San Antonio 2001)..65

*Mendoza v. State*, 88 S.W.3d 236, 238 (Tex. Crim. App. 2002)................64

*Pedraza v. State*, No. 04-13-00238-CR, 2014 WL 7442674 (Tex. App.—San Antonio Dec. 31, 2014) (not designated for publication) ................59

*Phillips v. State*, 650 S.W.2d 396, 401-02 (Tex. Crim. App. 1983)...........45

*Plata v. State*, 926 S.W.2d 300 (Tex. Crim. App. 1996)...........................65

*Potier v. State*, 68 S.W.3d 657, 666 (Tex. Crim. App. 2002) ....................76

*Prystash v. State*, 3 S.W.3d 522, 431 (Tex. Crim. App. 1999) ............69, 75

*Qualley v. State*, 206 S.W.3d 624, 631 (Tex. Crim. App. 2006)................53

*Rangel v. State*, 179 S.W.3d 64, 70 (Tex. App.—San Antonio 2005, pet. ref'd)................................................................46, 47, 77

*Sinclair v. State*, 894 S.W.2d 437, 440 (Tex. App.—Austin 1995, no pet.) (per curiam) ................................................................49

*State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999)43, 45, 47, 50, 51, 52, 53

*State v. Rangel*, 980 S.W.2d 840, 843 (Tex. App.—San Antonio 1998, no pet.)................................................................44

*Turner v. State*, 545 S.W.2d 133 (Tex. Crim. App. 1976) ..........................49

*Turner v. State*, 545 S.W.2d 133, 133 (Tex. Crim. App. 1976) .................46

*U.S. v. Franklin*, 148 F.3d 451, 457 (5th Cir. 1998)........................48, 51, 52

*Vasquez v. State*, 389 S.W.3d 361 (Tex. Crim. App. 2012)65, 66, 67, 71, 72

*Washington v. State*, 449 S.W.3d 555 (Tex. App.—Fort Worth 2005) .....66

*Wilson v. State*, 391 S.W.3d 131, 135 (Tex. App.—Texarkana 2012) ......56

*Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).......73, 74, 75

**Statutes**

TEX. CODE CRIM. PROC. art. 17.151 §1(1) .................................................49

TEX. CODE CRIM. PROC. art. 36.09.............................................................53

TEX. CODE CRIM. PROC. art. 36.14.......................................................64, 67

TEX. PENAL CODE § 22.01(a)(2) .................................................................56

TEX. PENAL CODE § 7.01(a) .................................................................56, 58

TEX. PENAL CODE § 7.01(c) ........................................................................70

**Rules**

TEX. R. APP. P. 44.2(b)....................................................................77

TEX. R. EVID. 103...........................................................................76

TEX. R. EVID. 803(2) ......................................................................74

**Other Authorities**

Appellant's Brief ..............................................................38, 51, 52, 59, 75

## STATEMENT REGARDING ORAL ARGUMENT

Although Appellant requested oral argument, he did not provide a statement in support of that request. Presumably, he seeks to argue primarily regarding the speedy-trial claim, sufficiency of the evidence and the alleged jury charge error. The State asserts that these issues are settled by the record and the case law, and therefore declines oral argument unless the Court, in its discretion, grants the Appellant's request.

TO THE COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS:

This brief is filed on behalf of Appellee, The State of Texas, by David L. Reuthinger, Jr., Assistant District Attorney.

## STATEMENT OF FACTS

*n.b. – the following statement of facts is almost identical to that in the State's Brief for the case of codefendant Francisco Javier Azuara (a/k/a "Paco"), which is pending as appeal number 04-14-00716-CR.*

### A. The Wounded Warrior

Alejandro Carreon is a soldier, who serves our country in the National Guard; his base of operations is Fort Hood. (9 RR 183). As such, he is familiar with firearms, gun combat, cover, tactics, positioning, and the application of that knowledge to defend against terrorists and militant insurgents. (9 RR 197-98). On July 7, 2013, he had to put his training to use—but the theatre of operations was not in Iraq, Afghanistan or Libya.

The warzone in question was in Laredo, Texas.

It was a nightclub called "D.J.'s Republic" on Shiloh Drive, in North Laredo. While he was not deployed, Mr. Carreon worked part-time as a bouncer there. (9 RR 183-84). It was about 1:45 a.m., close to closing time, and the bartenders were working on shutting down for the night. (11 RR 33). Suddenly, a fight broke out; this was known to happen at D.J.'s

Republic from time to time, so the bouncers knew what to do. (10 RR 237). The bartenders scrambled to rally the bouncers to commence bouncing rowdy patrons out of the club. (10 RR 35).



State's Exhibit 6, the exterior of the nightclub as described by Mr. Carreon. (9 RR 188)

Present in this fight was the Appellant: Alfonso Carlos Tamez, Jr., a/k/a "Pelón." Mr. Carreon saw someone hit Appellant with a bottle on the head; Mr. Carreon sprang into action to separate the people involved, with assistance from fellow security guard Leonel Perez. (10 RR 149). Appellant Tamez pushed someone away and tried "to take a swing" at someone. (10 RR 238). He was soon joined in the fray by Francisco Javier Azuara, known by his nickname "Paco." (9 RR 185). Due to both the fight and the imminent closing time, the bouncers began herding the belligerents outside. (10 RR 238, 11 RR 38). Mr. Carreon was quite occupied trying to control the chaos, but he thought that he saw Appellant and Paco leave the nightclub while he was bouncing the other fighters, (9 RR 186-87), though he later expressed some doubt about whether they actually left. (9 RR 197).

However, guard Leonel Perez recalled from the witness stand that he saw Appellant Alfonso Tamez quietly walk away; despite having had a bottle smashed on his head, he strangely "just turned around and left [the club]." (10 RR 150). Another club employee, Maria Santos, also saw Appellant leave the club in a white Hummer SUV—the same vehicle that he arrived there in. (10 RR 200-01, 206). Like Appellant Tamez himself, his white Hummer was a regular at the club, having been parked there in the VIP area just the past Friday. (10 RR 239). While the Appellant drove off in his white Hummer, the security staff continued escorting the brawlers out of the building. (10 RR 150).



State's Exhibit 8, the view which Mr. Carreon had from the entrance. (9 RR 188)

Mr. Carreon and the staff thought their job was done when the miscreants were out of the building—but then another fight erupted in the parking lot. (9 RR 187). This time, bottles began flying everywhere, and 20 to 25 people were duking it out. (10 RR 237, 238). Mr. Carreon was standing at the door of the club as he saw the outdoors fight begin in the club's

driveway. (9 RR 189). Mr. Carreon then stepped out of the club and into that driveway in an effort to break up the second fight. This was a fateful decision, as he was then about five feet from the entrance when something else interrupted the fight. (9 RR 202).

First, there was a screeching of tires, which one of the bartenders described as "someone [ ] trying to burn rubber." (10 RR 241). Angel Cruz-Avitu, also a security guard for the club, was outside helping to break up the fighters when he heard the screech. (11 RR 75-76). He turned to face a "dark-colored [Ford] Expedition" vehicle. He saw a man "getting out [of the Expedition's passenger door] with a dark-colored shirt wrapped around their hand." (11 RR 76, 77). He recognized that man as "Paco," meaning codefendant Francisco Javier Azuara, Jr. (11 RR 78, 79). Mr. Cruz-Avitu turned back around to help Mr. Carreon deal with the fighters. (11 RR 77, 78).

That was a mistake.

Five seconds later, there was a popping sound, which one of the bartenders called the sound of "firecrackers." (11 RR 35). But Mr. Carreon was familiar with that sound: he described it as gunshots that "just rang out … [from] the street." (9 RR 189-90). He turned to the direction of the

gunfire—it was towards Molly Street (9 RR 200)—where he saw a sport-utility vehicle. The SUV was light in color, but that is all he could see. (9 RR 200). He tried to get inside the club, but it was too late. (9 RR 198). A bullet struck him by his left ankle. (9 RR 191). He collapsed. (9 RR 193). Another bullet struck Mr. Cruz-Avitu, also in his ankle, and he too collapsed (11 RR 78, 80)—but not before he looked back and saw the same white Hummer, along with the dark Expedition that he had earlier seen Francisco Azuara exit from. (11 RR 79).

As Mr. Carreon fell, people began screaming and running. (9 RR 191). A woman fell, and then another security guard collapsed. (11 RR 37-38). One of the bartenders who saw these two fell shouted for everyone to "get down, [while the remaining guards] started … crouching people towards inside the building so that nobody else [would get] hit." (11 RR 37-38). Just a moment ago, all the patrons were being driven *out* of the club; now they were being driven back *in*, frantically, by the guards who were still able to stand.

Mr. Carreon could see through the fog of war to notice that the shooters were selective about their targets—mostly aiming for the security guards. He testified, "I think five of the securities that were working at that moment got shot. … It was several shots." (9 RR 192). He could also see

that the light-colored SUV was blocking the entrance to the parking lot at the time that the gunshots were fired. (9 RR 206).

Leonel Perez, another fellow security guard, was also targeted. He was doing crowd-control, and had his back turned towards Molly Street. He was close to the street—too close for comfort (10 RR 157)—when he testified that someone shouted "[¡]aguas[!]"[1] and then he heard "the gunshot go off… and got hit in my leg. I saw the white Hummer…. Up on Molly Street… I just saw the[ ] hand with a white shirt on and shooting towards us… [from the] front window, the passenger's side." (10 RR 152-53). He said that he knew that this vehicle, from which the gunshots emanated, was "Pelón Tamez's Hummer." (10 RR 154). He identified Appellant Tamez in court, along with Jessie Ortega,[2] who had a ponytail that



State's Exhibit 91, Mr. Perez resting at the hospital, where he provided his statement to the police. (9 RR 188)

---

[1] Meaning, "watch out!" (10 RR 179).
[2] Jessie Ortega was an acquitted codefendant.

night, echoing the ponytail that he briefly glimpsed in the front window of the Hummer. (10 RR 157). But then, the Hummer sped away up Molly Street. (9 RR 200, 10 RR 171).

Another security guard, Pedro Luna, Jr., was charged with separating the indoors fighters from the outdoors ones. (10 RR 179). Thankfully for him, that meant that he was in cover, unlike Mr. Carreon, who had left the building and was thus exposed to enemy fire. He recalled from the stand the fighting being interrupted by the shout of "[¡]aguas[!]" and the horrific sight of his "friends, my security, my bouncers that were next to me. I … saw them just like jump through the sides when they were getting hit. … By the shots. … It happened like so fast. Like, like I -- like I've said, it was just like (snaps fingers). It was just like that." (10 RR 180). He also saw the hand sticking out of the front passenger window of the white SUV. (10 RR 181). And he saw the whole Laredoan battlefield:

> It was crazy. Like it was -- I've never been through it, you know. You can see everybody running, trying to get cover. You're seeing -- I was just walking through not trying to get hit. You are seeing other people getting hit right next to you. You know, it was crazy. … There was a lot of screaming, a lot of screaming, a lot of people crying, yelling, everything. (10 RR 182).

Bartender Osmond Castillo was standing by the fence near the door when he heard the screeching and the gunshots, and saw the flood of

patrons running towards him for cover. (10 RR 243, 244). He was hit before he could get past the neon "OPEN" sign outside the club. (10 RR 233). As he fell to the ground, he could see that the white SUV was not alone. It had an escort, a "dark colored SUV, like a Tahoe[,]" according to bartender Osmond Castillo. (10 RR 241). He later told the police that this vehicle was possibly a Ford Expedition. (11 RR 19). Another security guard, Jose Arturo Garcia, also said that he saw two vehicles, the white Hummer and the dark Expedition, when he heard gunshots and took cover in the parking lot—only to see Angel Cruz-Avitu, his brother, falling from a gunshot. (11 RR 64-65). Neither Mr. Garcia nor Mr. Castillo could not tell which of the vehicles was the source of the gunshots, nor could Mr. Castillo tell if the object being pointed out of one of the vehicles was in fact a gun. (10 RR 242, 11 RR 14, 11 RR 66). But Mr. Castillo "just put two and two together" as he saw the vehicles speed down Molly Street into a small neighborhood. (10 RR 242). And he knew one of the vehicles escaping into the shadows was the same white Hummer he had seen at D.J.'s Republic earlier that night, and the night before that, parked in the VIP section. (10 RR 243).

## B. Leticia's Intuition

Jesus Guillen was relaxing outside his home, just down Molly Street from D.J.'s Republic, after a day of hawking action-packed video games at GameStop. (11 RR 25-26). He probably was not expecting his phone chat with his girlfriend to be interrupted by a gunfight action scene rivaling anything that his game consoles could produce, but that is exactly what happened when he heard gunshots coming from Molly Drive, followed by screaming and the screeching sound of vehicles taking off. (10 RR 27-28). A split second later, a red Dodge Ram truck came careening down the street from the source of the sounds. (11 RR 27-28). He instinctively took cover behind his father's truck in the driveway; perhaps all those first-person shooter games had taught him what to do, but this was not a game. (11 RR 28). After the red Ram passed, he observed "vehicles [leaving] and a lot of screams" from the nightclub. (11 RR 28). While he did not see where the shots came from, he knew that it was not from that Ram. (11 RR 29).[3]

---

[3] The police later confirmed that this Ram was not involved in the shooting. (11 RR 183).

Meanwhile, a flood of 911 calls began. One of the callers was Leticia Carreon—Mr. Carreon's wife. (9 RR 170). She pled with the operator: "Ma'am, I need an ambulance to D.J.'s Republic… I need somebody right now because they shot my husband. … I don't know who did it. … I didn't see who it was. I wasn't outside." (9 RR 170-71). She said the shooters "hit him on the front and … one of them straight through here…." (9 RR 171). Another caller said, "I need an ambulance as soon as you can. The address is 401 Shiloh. … There was a shootout. … I don't know the shooter, the guys, but me and some guys got shot at." The operator replied, "who was shot, sir?" The answer was gunshots, which could be heard even while the operator was talking. "Who was shot?," the operator asked again. The shocked caller could not speak coherently. "It was a guy. It was – no. It was somebody. There was like three guys. They got shot." The 911 operator tried to ask if the victims were still breathing, the caller said:



State's Exhibit 17, the blood-stained exterior of the D.J.'s Republic Nightclub. (10 RR 38-39)

"They're bleeding." More gunshots followed. Then the phone line clicked dead. (9 RR 168-69).

Laredo Police Officer Anthony Cabello was one of the patrol officers who were dispatched to respond to the 911 calls regarding the shooting at DJ's Republic. (10 RR 45). All that Officer Cabello knew from the dispatch that had come over his radio at 1:51 a.m. was that there was a "reported shooting, unknown number of shots fired, victims [ ] were hit with gunshot wounds, and that there were various vehicles leaving the area." (Id.; 10 RR 57). As Officer Cabello drove towards the nightclub, he saw a yellow Ford Mustang at the intersection of Shiloh Drive and McPherson Road—the major intersection just east of the nightclub. (10 RR 45). LPD Dispatch had reported that this was one of the suspect vehicles identified by the 911 callers. (10 RR 46). Therefore, Officer Cabello activated his cruiser's emergency lights and proceeded to stop the Mustang. (10 RR 46). Within were two women who had fled the night club; he concluded that they were not the gunmen, and continued on to the nightclub via Shiloh Drive, turning on Molly Street to approach the building. (10 RR 49).

While Officer Cabello was interviewing the occupants of the Mustang, Patrol Officer Aldo Alaniz arrived at D.J.'s Republic. It was

about 1:52 a.m. when Officer Alaniz, the first officer on the scene, pulled his car up to the club. (10 RR 110-11). He saw that "pretty much everybody was running out of the club, and everybody was yelling and screaming." (10 RR 111). Job one for him was to locate the victims—a task made easier by the fact that his first encounter was with "two males carrying what appeared to be a victim. He was yelling, and he had like a -- something wrapped around his leg." (Id.). Although he wanted to find the men who were responsible for this carnage, he first had to get the victims "the medical treatment [they needed] and [make] sure the scene was safe." (10 RR 113). Once he had worked his way inside the club and finished spotting the victims, he began interviewing the club's employees, who were "frightened, shaking, everybody was like scared." (10 RR 118-19). One of them was a bartender, Maria Santos, who stated that "she had seen a white SUV that committed -- that fired the shots." (10 RR 119). He was also approached by a manager of the club, who provided Officer Alaniz access to the security camera system. (10 RR 115). Officer Alaniz was thus able to switch from first response to investigation while other policemen worked on getting the scene under control.

Officer Alaniz was quickly joined by Patrol Officer James Boyd, who pulled up to D.J.'s Republic in his cruiser around 1:55 a.m. (10 RR

91) He described the scene as "mass chaos." Like Officer Alaniz, Officer Boyd's first priority was to protect and secure the victims. (10 RR 92-93). The first victim he saw was Mr. Carreon. He had suffered a gunshot wound to his ankle and was being tended to by another officer. (10 RR 93). Officer Boyd asked Mr. Carreon, the wounded warrior, what had happened, and he indicated that he had been shot from a vehicle which sped away on Molly Drive. (10 RR 93-94, 94-95).

Following Mr. Carreon's information, Officer Boyd "started searching the roadway in the area that he told me where the shots had been fired. And sure enough, [Officer Boyd] saw a few shell casings." (10 RR 95-96). He blocked off Molly Drive—which was now a crime scene—with his police cruiser and the vehicles of some other officers to ensure that the placing of the shell casings would not be compromised. (10 RR 96).



State's Exhibit 16, the blockade around Molly Drive. (9 RR 236).

While Officer Boyd was securing Molly Drive, Officer Cabello arrived at the D.J.'s Republic building around 2:15 a.m. (10 RR 52). By this time, the nightclub was bustling with police activity. The officers were interviewing witnesses and searching for shell casings and other forensic evidence of the gunshots. (10 RR 49-50). But there were still around thirty people inside the nightclub who were potential witnesses or suspects. (10 RR 54). Taking orders from Sergeant Rodriguez, Officer Cabello put up crime scene tape where the officers had located shell casings. (10 RR 50, 53). He then interviewed five witnesses who were patrons of the nightclub, and determined that none of them were the gunmen. (10 RR 51).

Officer Jaime Luis Vasquez was one of the first responders who was already present at the nightclub when Officer Cabello arrived. (10 RR 69-70). Officer Vasquez had been there when the injured victims were being evacuated by the paramedics. (10 RR 70-71). Officer Vasquez had observed that the victims had been shot low—some in the legs and others in the ankles. (10 RR 71). He was able to speak to some of them, but all they remembered was that *somebody* shot at them. (10 RR 71). Nobody knew who the gunmen were. In his words, it was a "chaotic scene." (10 RR 72). Like the other officers, Officer Vasquez worked on interviewing the

witnesses and searching the scene for any evidence as to who was responsible. It was all chaos and carnage, and everyone was searching for answers as to who committed this act of terror.

Meanwhile, Leticia Carreon was sitting with her injured husband and Officer Marcos Samaniego. (10 RR 120). She had an epiphany about who might have been responsible for striking down her brave husband—about who was there in the fight, about who had just left the fight before the shooting, about who had a white SUV. She got out her cell phone, dialed up the Appellant—Alfonso Carlos "Pelón" Tamez, Jr.—and she confronted him over the phone. (10 RR 121).

## C. Pelón Tamez's Hummer

Officer Samaniego came up to Officer Alaniz inside the still-chaotic club, holding Mrs. Carreon's cell phone, and reporting to Officer Alaniz that there was an involved individual on the line. (10 RR 120-21). Officer Alaniz asked the person to identify himself—Appellant Tamez did so, and stated that Leticia Carreon had accused him "of committing a shooting at the bar and that he didn't want any problems. So, he was going to drive back to the scene to speak with a detective." (10 RR 121). He notified

Sergeant Rodriguez immediately, and all officers present were put on notice that a suspect vehicle was coming back to the club. (Id.; 10 RR 80).



State's Exhibit 16, the Appellant's vehicle—"Pelón Tamez's Hummer," (10 RR 154).

Into the pitch dark of the parking lot came a white Hummer SUV. (10 RR 74). Francisco Javier Azuara was driving it. (10 RR 76-77). The Officers Alaniz, Vasquez, and Boyd promptly ordered the occupants out of the vehicle. (10 RR 77, 121). In the shotgun seat was Appellant, Alfonso Carlos "Pelón" Tamez, and a woman, Jessie Ortega, was in the back seat. (10 RR 76). "Paco" swiftly provided consent to Officer Boyd for the officers to search the vehicle, confident that he and the Appellant had done their level best to ensure that the officers would never find what they were looking for. (10 RR 77, 100). Officers Vasquez and Boyd noticed that

Jessie Ortega had left her purse in the Hummer, and they asked her to go back to the Hummer to bring the purse to them. (Id.). Officer Vasquez opened the door of the Hummer to allow her to do so. (10 RR 80). And that was when the pregnant silence gave birth.

*Cling.*

Officer Vasquez immediately knew what that sound was. (10 RR 77, 86). He glanced under the Hummer. (10 RR 77). All of the witnesses had said that the shots came from the direction of Molly Drive, to the east of the club. (10 RR 86, 93). But when the Appellant and company drove the Hummer back to the club, they had parked it on the north side of the club, where the officers now were—not the east side, where Officer Boyd had blocked off the street. There was no reason for there to be a *spent bullet casing* on the north side of the club, since there was no evidence that the shots came from there. (10 RR 87). But that is what Officer Vasquez saw in the direction from which the *cling* sound had come: a spent bullet casing, barely visible under the side door of the Hummer. (10 RR 77). The only logical explanation for the presence of the casing was that someone

had recently fired a gun from the inside of this white Hummer SUV—and this conclusion was corroborated by Mr. Carreon's recollection of a light-colored SUV being the source of the gunshots.

Officer Vasquez silently signaled Officer Boyd to share his discovery. (10 RR 101). While Officer Boyd went to tell the sergeant what they had found, (10 RR 102), Officer Vasquez carried on with the consensual search and interview of the Appellant and his posse, knowing that they were not aware of what Jessie had accidentally knocked out of the Hummer. (10 RR 78). So the Appellant and company rambled on while the officers continued to collect evidence against them.

### D. The Plot Thickens

From the scene, bloody clothing, shoes, bullet casings, slugs, and fragments, and gunshot residue samples were collected. (9 RR 213). Thirteen 9-mm casings were collected. (9 RR 214). Two .380 casings were collected as well; this included both the casing that made the "cling" sound as well as an additional casing that was found near Appellant Tamez's white Hummer SUV. (10 RR 21, 35-36). Hence, a total of 15 casings were collected; the officers did not know their caliber at the time of collection.

(11 RR 212). The bullet pieces and gunshot residue samples were sent to the Bexar County crime lab. (9 RR 216, 223).

The lab examined the microscopic ballistic signatures on the bullet fragments and casings. (11 RR 108). The technicians found that the bullet casings found in and around the Hummer were of .380 caliber, and the ones from Molly Road were 9-millimeter. (11 RR 249). Hence, two different guns were responsible for the Hummer casings versus the Molly Road casings. (11 RR 123). The Appellant was quick to jump on this as vindication, along with the fact that neither Appellant nor Paco had gunshot residue on their hands—at least at the time they returned to the club. (11 RR 137, 145). Therefore, corroboration of the roles of Appellant and Paco would have to come from the witnesses, not the laboratory.

Meanwhile, Mr. Castillo, the bartender, was airlifted to San Antonio to have his leg treated. (10 RR 244). His wound was more than just physical, though. He was afraid to talk to the police about what had happened. His father went with him to the police station at the time of the interview, and urged him not to get involved with the pursuit of the gunmen. So while he knew who drove the Hummer, he was afraid to tell the police. (10 RR 24).

It can thus be seen that the witnesses were too shell-shocked to recall or give all the details that they had observed when the police took the witnesses' statements that night and morning. For example, Mr. Perez's statement did not mention that he saw a hand sticking out of the Hummer, or a gun in that hand, as he testified in the trial court. (10 RR 166-67). Mr. Perez also said that he did not know Francisco Azuara except through people who knew people at the night club. (10 RR 173). The defense also tried—and continues to try—to sow reasonable doubt about a Rocky Benavides or Daniel Garcia as being other fighters who could have had motive to retaliate against the guards with gunfire. (10 RR 187). The Appellant also pointed to the investigators' testimony that no gunshot residue was found in the Hummer, (10 RR 224), and that no weapons-related evidence was found in the homes of Appellant and Francisco Azuara. (10 RR 50-55).

While Mr. Cruz-Avitu did see Appellant and Azuara in on the action, but he knew them only by their nicknames (i.e., "Pelon" and "Paco") and not their "name names." (11 RR 82, 92). At first he seemed to say that both "Pelon" and "Paco" were nicknames for Appellant Azuara, (11 RR 78, 92), but then clarified said that they were different people, with Pelón—"bald guy"—being Appellant Tamez (who is indeed somewhat

bald), and Paco being Francisco Azuara (as "Paco" is short for "Francisco"). He also expressed confusion about their clothing that night; at first, he said that "Mr. Azuara was wearing a white shirt[,]" (11 RR 93), while Tamez [the Appellant] was wearing a dark, long-sleeved shirt. (11 RR 91). But on redirect examination, he corrected himself; he said it was Pelón (Appellant) wearing the "white shirt with designs[,]" (11 RR 95) and Paco (Francisco Azuara) with the dark shirt. (Id.). And he doubled down on it being the man in the dark shirt, Francisco Azuara, who got down from the Ford Expedition just before the shooting began. (11 RR 99). He also believed that another man was present as the driver, but could not confirm this, and he did not know which of them fired the gun. (11 RR 101, 103).

Another victim-patron of the club, Jonathan Santos, gave a statement to LPD that "I just saw in the club, D.J.'s, I saw a fight in the D.J.'s Republic and went outside and I hear the shots and **Pelón, [Appellant] Tamez, shot me in the left knee, and I saw him with the gun. And he went to the truck -- into the white truck, the Hummer, and left.**" (11 RR 168) (emphasis added). He stated that this information was given to him by Maria Santos. (11 RR 170). After he gave the statement, he later claimed that the shooter was instead someone named "Pewi"—but only

after he was threatened by the "girl[friend] of Pelón [Appellant Tamez]" who tried to intimidate him into not testifying against Tamez (11 RR 169, 173). The cover-up was unraveling.

### E. "We Cleaned Up"

The investigators continued pressing in on Appellant and Azuara, first reviewing the surveillance video depicting them, and then interviewing them along with their companion, Jessie Ortega. After being Mirandized, Appellant Tamez admitted that he was the "front passenger" in the white Hummer while Appellant Azuara was driving the Hummer for the entire time that the posse was together. (11 RR 201-02).

Through the club's video surveillance system, the investigators confirmed that Appellant Tamez, Azuara, and Jessie Ortega arrived together at the nightclub at 1:39, and left together at 1:43—and Appellant Tamez was seen on video changing his shirt. (11 RR 198). The investigators soon discovered why the gunshot residue testing on them had come back negative:

> On the clothing we observed one of the male subjects wearing shorts and a tank top, and it's pretty obvious you're not going to show up to a nightclub wearing that. And that has to be recovered and sent to evidence. It was later learned that the defendants had changed clothing … [that was over] an hour [after the shooting]. (11 RR 181).

Jessie Ortega also said that Appellant Tamez was taking his shirt off as the trio were exiting the club. (11 RR 210). It is no wonder, then, that Appellant Tamez practically begged the investigators to run a gunshot residue (GSR) test on the Hummer during his interrogation—he knew they would not find any, because he knew how to clean up after himself and destroy the GSR evidence. (11 RR 201, 204-05).

It seemed that Appellant Tamez also knew how to prevent GSR traces from being left at all: Several witnesses saw that the menacing hand raising the gun was also holding that gun wrapped in a shirt or white rag. (11 RR 76, 77); (10 RR 152-53). According to the ballistics lab expert, GSR residue emanates in a cloud from a gun when it is fired. (11 RR 130). What would happen to the GSR residue if the gun was wrapped in a rag or shirt when it was fired, then? Where would it go—into the air, or onto that piece of clothing for convenient spoliation of evidence?

Azuara admitted, in his own interview, that he washed himself *and his clothing* up after the posse left the club—but then he incredulously denied that he had washed his hands at all. (11 RR 207-08). Azuara also changed his story about being the driver of the Hummer when they left the club. "Mr. Azuara stated that he was driving, and then later on recanted the statement and stated that [Appellant] Tamez was driving." (11 RR 206).

Although Azuara waffled about who was in which seat, he did admit that the vehicle in question was a white Hummer. (Id.) And, of course, he urged the police to hurry up and do GSR testing, while assuring them that they would find nothing. (11 RR 205).

After interviewing Appellant Tamez, Azuara, Jessie Ortega, and the victims and witnesses, the investigators had established a timeline: the trio, including Appellant, arrived at the club at 1:43 a.m., and left just three minutes later at 1:46 a.m. as the security camera watched. (11 RR 199). Then, several witnesses saw them return seven minutes later—in one of those two vehicles that were seen on Molly Drive just before the shooting, and which sped away immediately after:

- **Appellant Tamez.** Maria Santos saw Tamez *actually fire the weapon*, according to Jonathan Santos, who withdrew that statement—but only after being intimidated by Tamez's girlfriend. (11 RR 168, 227-28). Maria Santos also identified Tamez's Hummer as one of the two involved vehicles in her own testimony, and confirmed that Tamez was in the Hummer earlier that night. (10 RR 119, 200-01).
  - o Leonel Perez identified "Pelón Tamez's Hummer" as being the vehicle that the shots were fired from. (10 RR 154).
  - o Other witnesses said that the shooter was near the other involved vehicle, the dark Expedition, which was adjacent to that Hummer.

- o Investigator Edgar Garza testified that the placing of the casings "could indicate that the [shots were fired from the] vehicle [while it] was stationary[,] or it can also indicate that somebody was standing and then there's a small trail, which means that the person or the vehicle was in motion [and shooting]." (11 RR 228).

- **Azuara.** Angel Cruz-Avitu saw a person who looked like "Paco," meaning Francisco Azuara, outside the Expedition immediately before the shooting. (11 RR 78, 79, 99). And "Paco" had something wrapped in his hand immediately before the shooting. (11 RR 78, 79). After the shooting, it was indeed Azuara who drove the Hummer back to meet the officers—with Appellant Tamez and Ortega aboard. (10 RR 76-77). Azuara then admitted to washing himself and his clothing before the posse returned to the club to meet with the officers—only to inexplicably recant about washing his hands when gunshot residue was being discussed. (11 RR 207-08). Azuara then tried to change his story to make the Appellant the driver of his own Hummer. (11 RR 206).

- **Ortega.** Leonel Perez saw a passenger with a ponytail in the Hummer, matching acquitted codefendant Jessie Ortega. (10 RR 154). Ortega confirmed that she was present with Appellant Tamez and Azuara during the events in question. (11 RR 208-09).

As Investigator Garza testified, the "common denominator was the Hummer." (11 RR 229). "Pelón [Appellant] Tamez's Hummer." (10 RR 154). The Hummer seen by virtually every eyewitness during the shooting; the Hummer that sped away with the Expedition into the darkness, the same Hummer that came back to the club, driven by Azuara, when Mrs.

- 33 -

Carreon confronted Appellant Tamez about his role. The Hummer that Pedro Luna saw the hand with the gun sticking out from. (10 RR 181). The Hummer that Mr. Carreon saw as he fell to the ground while taking enemy fire. (9 RR 200). The Hummer that sped away up Molly Street immediately after the shooting. (9 RR 200, 10 RR 171). The Hummer that Azuara then tried to deny driving that night, after having admitted to it—while also admitting to washing himself and his clothing. The Hummer of which the codefendants boasted—the Hummer in which they insisted the police would never find any evidence. The Appellant's Hummer. "Pelón Tamez's Hummer."



State's Exhibit 119

"We cleaned up[,]" were Azuara's exact translated words about his role. (11 RR 207). The jury did not think that Azuara or the Appellant cleaned up enough. Appellant and Azuara were convicted of all seven

counts of felony-2 aggravated assault. (11 RR 6-8). Jessie Ortega was acquitted of all of the counts. (Id.) That did not stop Jessie Ortega from joining in with the rest of the posse to cuss out each other and threaten the State's attorney as Appellant and Azuara were taken into custody. (11 RR 9-12). The jury shipped the Appellant and Azuara off to prison for 14 ½ years and fined them $2,500 for each count. (12 RR 44).

"Pelón" Appellant Tamez now asserts (1) he was denied a speedy trial by a one-month continuance even though he did not ask for a severance; (2) that the evidence was legally insufficient to tie him to the seven shootings, whether as a principal or as a party; (3) that the jury charge was erroneous because it did not identify who the State alleged to be the primary actor (the gunman); and (4) that the trial court abused its discretion by admitting Officer Alaniz's account of Maria Santos's excited utterance that the shots came from a white SUV and that the shooters were involved in the previous bar fight. The State responds as follows.

## GENERAL SUMMARY OF THE ARGUMENT

Appellant's first issue, concerning whether he was denied a speedy trial, should be overruled because Appellant failed to timely request a speedy trial, and the Appellant has not shown that the one-month continuance made to facilitate a joint trial caused him specific prejudice. Moreover, the remedy for Appellant to avoid being tried together with Azuara and Ortega was not a motion for a speedy trial, but rather, a motion for severance. Appellant did not ask for a severance, nor would he have been entitled to a severance had he asked for it.

Appellant's second issue, concerning sufficiency of the evidence, should be overruled because there was copious evidence of suspicious circumstances that showed his role in the shootings to be far beyond mere presence. One witness identified him as the shooter, and almost all of the witnesses identified "Pelón [Appellant] Tamez's Hummer" as being directly involved in the shooting, whether as the vehicle from which the shots were fired, or as one of the vehicles that sped away from the area from which the shots were fired.

Appellant's third issue, concerning jury charge error, should be overruled because there is no requirement that the State identify the

principal actor in the jury charge. Even if there was such a requirement, Appellant cannot show that he was harmed, egregiously or otherwise, because any issues with the charge were rendered harmless by the record and the arguments of counsel.

Appellant's fourth issue, concerning the admission of an alleged hearsay statement, should be overruled because the trial judge could have found, and did find, that the statement was an excited utterance. Moreover, the utterance was cumulative of copious non-hearsay testimony about the role of the Hummer, which prevents the Appellant from showing harm.

## ISSUES PRESENTED

**RESPONSE TO POINT OF ERROR NO. 1 (Speedy Trial):**

**Whether Appellant was denied a speedy trial when the State was granted a one-month continuance to facilitate a joint trial?**

## STATEMENT OF FACTS

Appellant was arrested on August 6, 2013. (CR 54). He was released on a personal bond on December 13, 2013. (CR 56).[4] He was then indicted on March 26, 2014, (CR 54), and trial commenced on July 21, 2014, four months later. (CR 34). Hence, the total time from arrest to trial was sixteen months.

Appellant first requested a speedy trial by motion which was filed and heard on April 2, 2014. (2 RR 4, CR 22). This was eleven months after he was arrested. At that time, the following exchange occurred:

THE COURT: I can bump you up if you can get ready.

MR. CHU [Defense counsel]: We can get ready, Your Honor.

---

[4] The Appellant does not mention this bond in his brief. He makes reference to having had an examining trial before a different justice of the peace ("JP"), who ordered him released pending the indictment, but there does not seem to be any documentation of this in the record. (Ant. Brief at p. 6). That release was indeed ordered, but it did not ultimately happen due to it being vetoed by the parole board. In any event, the JP's order is not helpful to him; that he sought release (rather than trial) weighs *against* him because it shows that he did not truly want a speedy trial. *See Barringer v. State*, 399 S.W.3d 593, 601 (Tex. App.—Eastland 2013).

THE COURT: Give me other deadlines that are a little sooner than that July trial setting. Maybe give me something with a trial setting in June?

COURT COORDINATOR: June 23rd, Judge.

THE COURT: You want to go backwards from there?

MR. CHU: Yes, ma'am.

COURT COORDINATOR: Final pre-trial June 16th.

THE COURT: All right.

COURT COORDINATOR: Pre-trial would be May 27th, and informal[ pretrial conference] on April 29th at 2:00.

MR. CHU: That would be great, Your Honor. (2 RR 5).

At the formal pretrial conference on May 27, 2014, it was established that counsel for Appellant had not yet conferred with counsel for the State. (4 RR 4-5). The trial court reset the pretrial conference for June 16, 2014, with the trial setting remaining June 23rd. (Id.) By June 23, 2014, a new State's attorney had taken over the case, and the following exchange occurred:

MR. GARCIA [new prosecutor]: Your Honor, I just took over the case, and I believe that --I don't know if -- so, is opposing counsel requesting that they be tried  separately, so that they be severed, Tamez and Azuara?

MR. CHU [defense counsel]: They are tried separately because we had filed a speedy trial motion for M. Tamez. Mr. Tamez, he has been in custody since August 2013. The Court has already granted that.

THE COURT: Right, just because I reset Ms. Ortega, that doesn't necessarily mean that I'm going to reset Mr. Tamez. He's still set for trial.

MR. GARCIA: Uh-huh. And, Your Honor if I may, as to the speedy trial, was there a hearing for the speedy trial?

THE COURT: I don't know that he's urged it. I think he's just ready for trial.

MR. GARCIA: Oh, okay.

MR. CHU: I think that the Court has granted that. We had a little bench conference with the Prosecutor, Mr. Vega at that time; and then after that, Your Honor, after hearing that Mr. Tamez has been in custody for so long, granted our motion –

THE COURT: Let's keep it on for trial.

(5 RR 5-6). The trial court confirmed that counsel's request was "**not asking that it be severed.** He's asking that he stay on for trial on June 23rd." (5 RR 8) (emphasis added). On June 16, 2014, the State moved for a one-month continuance so that—as no formal severance had been made—the codefendants could be tried together on July 21, 2014. (CR 27, 242). The State noted that, in addition to the lack of a severance, there had been no formal hearing to determine whether or not Appellant's speedy-trial rights had been violated. (CR 242).

Appellant objected, primarily on the basis of the speedy-trial motion having already been urged and the State's motion being unsworn. (CR 228). But after an off-the-record discussion, the trial court granted the

State's motion based on "the fact that in the interest of judicial economy, it would benefit the parties from one trial, [albeit], that there may be a severance of Defendants later." (6 RR 4-5). Although now thrice advised of that option, twice by the court and once by the State, Appellant never requested a severance. Instead, Appellant's counsel appeared at the final pretrial hearing on July 3, 2014, where he announced ready for trial and confirmed that he represented two codefendants, Appellant and Francisco Azuara. (7 RR 4-5).

## SUMMARY OF THE ARGUMENT

Assuming arguendo that a sixteen-month period from arrest to trial was presumptively prejudicial, this did not discharge the Appellant from his burden to timely move for a speedy trial or to show prejudice, and he failed to do either. A movant who wants a speedy trial has a duty to seek it, even before he is indicted—and this Appellant did not do so until almost a year after his arrest; and even then, he agreed to a trial date that was ultimately continued by *one month*, which is not a prejudicial delay. The reason for the continuance was to achieve a joint trial, and the delay was therefore justified. Though Appellant now says he was prejudiced because he really wanted to have his own trial rather than be tried along with

Azuara and Ortega, this is not a specific articulation of prejudice because he has not, and cannot, show a reason why the joint trial infringed on his rights. Moreover, Appellant's proper remedy was to ask for a severance; having declined to do so, he cannot show prejudice.

## **ARGUMENT AND AUTHORITY**

### **A. Standard of Review**

In determining whether an accused has been denied his right to a speedy trial, a court must use a balancing test "in which the conduct of both the prosecution and the defendant are weighed." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). The four factors to be weighed in the balance include, but are not necessarily limited to, the length of the delay, the reason for the delay, the defendant's assertion of his speedy trial right, and the prejudice resulting from the delay. *Id*. No single factor is necessary or sufficient to establish a violation of the right to a speedy trial. *Id*. at 533; *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003).

Review of these individual factors necessarily involves fact determinations and legal conclusions. The balancing test as a whole, however, is a purely legal question. *Johnson v. State*, 954 S.W.2d 770, 771 (Tex. Crim. App. 1997). As such, there is a bifurcated standard of review: an abuse of discretion standard for the factual components and a de novo standard for the legal components of the trial court's decision. *State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999). When reviewing any disputed facts, and the application of the law to those facts, the appellate court should do so in the view that is most favorable to the trial court's ruling. *Id.* (citing *Guzman v. State*, 855 S.W.2d 85 (Tex. Crim. App. 1997)).

The Appellant originally assented to a setting on June 23, 2014. Therefore, the fight in the trial court was over the State's motion for a one-month continuance to July 21, 2014, which the trial court granted. (6 RR 5). Since the State won the speedy-trial fight in the trial court, the Court should view the record in favor of the State, presuming that the trial court resolved contested issues in the State's favor. *See Munoz*, 991 S.W.2d at 822.

## B. The *Barker* Four-Factor Test

The first *Barker* factor is the length of the delay itself. *Dragoo*, 96 S.W.3d at 313-14. The clock runs from when the defendant has notice of the charges against him, such as when he is arrested or formally accused. *State v. Rangel*, 980 S.W.2d 840, 843 (Tex. App.—San Antonio 1998, no pet.). Unless the delay was long enough to be presumptively prejudicial—meaning "unreasonable in the circumstances"—there is no need for the Court to proceed beyond this factor. *Id.* Generally, one year from arrest to trial is a long enough delay to trigger the evaluation of the rest of the *Barker* factors. *Dragoo*, 96 S.W.3d at 314. This Court has drawn that line at eight months. *Rangel*, 980 S.W.2d at 843. And the longer the delay after that, the stronger the delay factor weighs in favor of the defendant. *See Dragoo*, 96 S.W.3d at 313-14. Even so, there is no length of time that is dispositive; even a three-year delay is not in and of itself fatal, especially if the defendant is guilty of sitting on his rights during the long delay. *See id.* at 314-15; *Barringer v. State*, 399 S.W.3d 593 (Tex. App.—Eastland 2013) (eight-year delay not a violation due to lack of prejudice); *see also Ingram v. State*, No. 04-09-00249-CR, 2010 WL 1609696, *3-4 (Tex. App.—San Antonio April 21, 2010) (not designated for publication) (four-year delay was not a violation when appellant asserted speedy-trial only once).

The second factor, reason for the delay, is one on which the State has the burden to articulate the reason for the delay on pain of counterweight against the State; however, the weight assigned to this factor is weighted differently depending on the reason for the delay. *Munoz*, 991 S.W.2d at 822 (citing *Barker*, 407 U.S. at 531). If the State deliberately delays the trial without justification, or for the purpose of harming the defense, this is naturally taken heavily against the State. *Id*. A more neutral reason such as negligence or overcrowded courts will still be weighed against the government, but less heavily. *Id*. And if there is a valid justification for the delay, then the delay will not be weighed against the government at all. *Id*. And as with the first factor, it remains a truism that thou may not squat on thine rights—if the defendant has been complicit in the delay, whether in whole or in part, this may serve to waive[5] the entire speedy trial claim. *Id*.

---

[5] Previous opinions had stated that speedy-trial claims could not be waived, and that "even a total failure to insist on a speedy trial is not *ipso facto* determinative" as a waiver of the speedy-trial right. *Phillips v. State*, 650 S.W.2d 396, 401-02 (Tex. Crim. App. 1983). The Court of Criminal Appeals has since made it clear that "delay which is attributable in whole or in part to the defendant may even constitute a **waiver** of a speedy trial claim." *Munoz*, 991 S.W.2d at 822 (emphasis added); *see Ingram* at *2 (citing *Munoz* accordingly); *see also Cano v. State*, 369 S.W.3d 532, 534 (Tex. App.— Amarillo 2012) ("We liken the argument being urged [that *Munoz* actually held that speedy-trial claims were *unwaivable*] as an attempt to graft avocados onto a pecan tree, disagree with it, and overrule the [appellant's] motion [for rehearing].").

The third factor is the issue of whether the Appellant asserted his right to a speedy trial, and—once again—the haste or hesitancy with which he did so. *Id.* at 314. The burden on this issue is on the appellant to show he asserted his right and was persistent in his request. *Gullatt v. State,* 368 S.W.3d 559, 571-72 (Tex. Crim. App. 2011). This factor is entitled to strong evidentiary weight. *Rangel*, 980 S.W.2d at 840 (citing *Barker*, 407 U.S. at 531-32). "Failure to assert the right makes it difficult for the defendant to prove that he was denied a speedy trial, and may result in a **waiver** of the right." *Rangel*, 980 S.W.3d at 844 (emphasis added). Accordingly, it is again the Appellant's responsibility not to squat on his rights, but rather to "show that he had tried to get the case into court so that he could go to trial in a timely manner." *Cantu*, 253 S.W.3d at 284. This duty to zealously assert the speedy-trial guarantee attaches at the moment that Appellant knows about the proceedings, even before any formal charges are made. *Cantu*, 253 S.W.3d at 284-85. Therefore, the Appellant must quickly and diligently pursue the right to a speedy trial. *Turner v. State*, 545 S.W.2d 133, 133 (Tex. Crim. App. 1976) (holding appellant's diligence was sufficient when he filed multiple petitions and motions requesting a trial setting starting four months from when he first had notice of the state proceedings).

The fourth factor, prejudice, is one on which the defendant bears the burden. And this burden is very specific: absence of "excessive" bad-faith or "excessive" negligent delay by the government, a defendant usually has to show "specific prejudice" to his defense. *Munoz*, 991 S.W.2d at 829. This prejudice must be material to the interests which the constitutional right to a speedy trial was meant to protect: "1) prevention of oppressive pretrial incarceration; 2) minimization of the accused's anxiety and concern; and 3) limitation of the possibility that the accused's defense will be impaired." *Rangel*, 980 S.W.2d at 844.

For example, the Appellant could show specific prejudice under the third interest by showing he was denied the opportunity to present a key component of his defense, that this denial *was a result of the pretrial delay*, and that the Appellant took curative measures to mitigate the prejudice. *See McCarty v. State*, 498 S.W.2d 212, 216 (Tex. Crim. App. 1973). Hence, to show *Barker* prejudice through impairment of the defense, there is a three-step dance: there must be (1) a pretrial delay; (2) which delay leads to an issue; (3) and that this issue impaired the Appellant's defense and therefore prejudiced him.

## C. Application of the *Barker* Factors

**Length of the delay.** In this case, the length of the delay between arrest and trial is a bit over a year. This is long enough to trigger consideration of the other *Barker* factors, but not long enough to weigh significantly in favor of the defense. While the Appellant complains particularly of the one-month delay resulting from the State's granted continuance, the record shows that this continuance was made to achieve a joint trial. As such, the one-month delay is not relevant to a speedy-trial claim. *U.S. v. Franklin*, 148 F.3d 451, 457 (5th Cir. 1998). So if this factor weighs against the State at all, the weight is rather light.

**Reason for the delay**. The record indicates that the reason for the delay was to facilitate a joint trial of all of the codefendants in the name of judicial economy. Both logic and consistent federal decisions indicate that joinder of trials for judicial economy is a justifiable reason for delaying a trial in the face of an assertion of the speedy-trial right. *Id*. at 457. Justified delays are not taken against the State. *Munoz*, 991 S.W.2d at 829. That means that this factor weighs against Appellant.

**Assertion of the right.** The Appellant waited until almost a year after his arrest to request a speedy trial. This is not a timely assertion of the right. *See Grayless v. State*, 567 S.W.2d 216, 221 (Tex. Crim. App. 1978)

(one year and two months after arrest was not a timely assertion); *cf. Turner v. State*, 545 S.W.2d 133 (Tex. Crim. App. 1976) (four months after arrest was timely). It is no excuse that the indictment came in March of 2014. The Supreme Court has held that "invocation of the speedy trial provision ... need not await indictment, information, or other formal charge." *Cantu*, 253 S.W.3d at 284-85 (citing *Dillingham v. U.S.*, 423 U.S. 64, 65 (1975)). Apparently, Appellant waited until December of 2013 to request a personal bond, which he obtained from a justice of the peace. (CR 56). At that time, he "could [ ] have filed a motion to dismiss the complaint against [him] in that court, … before [he] was indicted." *Cantu*, 253 S.W.3d at 284, n. 54 (quoting *Sinclair v. State*, 894 S.W.2d 437, 440 (Tex. App.—Austin 1995, no pet.) (per curiam)). He could have done this even earlier; even if he was unable to make bond, he would have been entitled to a personal recognizance bond 90 days after his arrest—on August 6, 2013. TEX. CODE CRIM. PROC. art. 17.151 §1(1). At that time, he could have filed a motion to dismiss the complaint. *Cantu*, 253 S.W.3d at 284, n. 54. He did not. Instead, he let nine months pass until his attorney finally moved for a speedy trial on April 2, 2014 and finally moved for a section 17.151 habeas release on July 11, 2014. (CR 247). Since Appellant

squatted on his rights, that delay weighs heavily against him on this and all four factors.

**Prejudice.** The final *Barker* factor puts "the burden [ ] on the accused to make some showing of prejudice which was **caused** by the delay of his trial." *McCarty*, 498 S.W.2d at 216 (emphasis added). This articulation must be specific. *Munoz*, 991 S.W.2d at 829. Therefore, the Appellant must articulate *Barker* prejudice by demonstrating that the delay *caused* a specific issue which *further caused* an infringement upon one or more of the three interests that the right to a speedy trial was designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize the accused's anxiety and concern; and (3) to limit the possibility that the accused's defense will be impaired. *Id.*; *Dragoo*, 96 S.W.3d at 315. Appellant points to nothing about the first two interests, and it would be hard for him to make a complaint about them since he could have bonded out sooner in order to relieve those concerns.

As to interest three, avoiding prejudice to the defense: Appellant says that he was prejudiced by being forced to be tried alongside the other codefendants, Azuara and Ortega, and that this impaired his defense by

forcing the jurors to "decid[e] who shot at the victim in the indictment."[6] (Ant. Brief at p. 21-22). However, there is no proximate relationship between the pretrial delay and the fact that Appellant was tried alongside the codefendants. Rather, the delay was a side effect of the court's decision to grant the State's motion for continuance, which was done for the express purpose of trying the defendants together in the name of judicial economy. (6 RR 4-5). That was a valid reason to continue the trial in the face of Appellant's speedy-trial assertion. *Franklin*, 148 F.3d at 457. Further, the trial court expressly found that "it would benefit the parties [by having] one trial….[,]" (6 RR 5), and this factual finding by the trial court that Appellant was *not* prejudiced by the delay is subject to deference on appeal. *See Munoz*, 991 S.W.2d at 822.

Nor is there a causal relationship between the joint trial and any impairment of Appellant's defense. The defendant is required to articulate such a causal link between the pretrial delay to show "specific prejudice." *See Munoz*, 991 S.W.2d at 818. The Appellant attempts to do so by saying that the joint trial was a "tactic to group try the Parties together so as to

---

[6] Ironically, in Issue No. 3, Appellant is *also* claiming that it was error to send the jury a charge in which they *did not* have to decide who the primary actor was.

attempt to force the jurors" to decide who was the primary actor.[7] (Ant. Brief at 12-13). That is, of course, the very function of a jury. Appellant's argument that trying the parties together facilitated the jury's function as finder of fact verifies that the joinder served judicial economy, which ultimately benefits, not prejudices, the Appellant—as found by the trial court. *See Franklin*, 148 F.3d at 457. Appellant also failed to take curative measures to avoid the alleged prejudice, such as by requesting a severance. That was the route to take to challenge the trial court's finding that a joint trial benefited him. Appellant declined to take that road when he had the chance. This suggests both a lack of diligence and a potential waiver of the speedy-trial claim. *See Munoz*, 991 S.W.2d at 822

The Appellant has therefore shown, at best, that one out of four factors (length of the delay) favors him, and then only barely since he waited so long to start asking for a speedy trial. The final factor should accordingly be taken against Appellant. Appellee has shown, at most, minimal prejudice, and so his speedy-trial claim fails. *See Munoz*, 991 S.W.2d 830.

---

[7] Ironically, in Issue No. 3, Appellant is *also* claiming that it was error to send the jury a charge in which they *did not* have to decide who the primary actor was. This is further evidence that Appellant wanted a severance, not a speedy trial, and tried to use a speedy-trial motion to get a severance without proving it up.

## D. Appellant Was Not Entitled to a Severance Even Had One Been Requested

The Court can see that Appellant's "speedy trial" motion was really an attempt to sever his trial from that of the codefendants without meeting the requirements to obtain a severance. Those requirements are (1) that a motion for severance be timely requested, and (2) that the motion submit evidence to show that one of the codefendants has a previous admissible conviction or that the Appellant would be otherwise prejudiced by a joint trial. TEX. CODE CRIM. PROC. art. 36.09; *Qualley v. State*, 206 S.W.3d 624, 631 (Tex. Crim. App. 2006). So here again is the requirement that the Appellant demonstrate not just that there will be a joint trial that he does not want, but some specific prejudice that would result from the joint trial. *Compare Qualley,* 206 S.W.3d at 631 *with Munoz*, 991 S.W.2d at 818. Again, the Appellant has not put forward any evidence about why the joint trial was prejudicial, except to confuse judicial economy with prejudice, a path foreclosed by the trial court's finding that the joint trial would benefit Appellant. (6 RR 4-5).

As such, the State respectfully requests that Appellant's first issue, concerning denial of a speedy trial, be overruled.

**RESPONSE TO POINT OF ERROR NO. 2 (Sufficiency):**

**Whether the evidence is legally insufficient to prove that Appellant Tamez committed the offense of aggravated assault with a deadly weapon as a principal or "as a party by aiding" in each of the seven counts?**

## SUMMARY OF THE ARGUMENT

Appellant was identified as the gunman by a witness. His Hummer was almost unanimously identified by the eyewitnesses as being involved in the crime. The finder of fact could easily have found that he intentionally or knowingly aided in the commission of the offense. Accordingly, the evidence of Appellant's guilt is more than legally sufficient.

## ARGUMENT AND AUTHORITY

### A. Standard of Review

Appellant challenges both the "legal" and "factual" sufficiency of the evidence to support his conviction. Factual sufficiency review has been abrogated. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App.

2010) (plurality opinion). The only evidentiary-sufficiency standard used is that of legal sufficiency. *Id.*

When conducting a legal-sufficiency review, the Court should view the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Lane v. State*, 151 S.W.3d 188, 191-92 (Tex. Crim. App. 2004). The key question is whether "the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Hinojosa v. State*, 433 S.W.3d 742, 752 (Tex. App.—San Antonio 2014, pet. refused). This legal sufficiency standard applies equally to both direct and circumstantial evidence. *Id*. (citing *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000)).The jury has the exclusive role of judging witness credibility, measuring the weight of the evidence, and deciding how to resolve conflicts in the evidence. *Id.* (citing *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996)). In so doing, the appellate court should presume that the jury resolved the conflicts in favor of the State and therefore defer to that determination. *Id*. The jury has the exclusive providence to resolve conflicts in the evidence, and they may believe or disbelieve all or any part of a witness's testimony, regardless of whether

that testimony has been contradicted. *Dorsey v. State*, 24 S.W.3d 921, 924 (Tex. App—Beaumont 2000, pet. ref'd).

## B. Elements of the Offenses

Appellant was indicted for seven counts of the offense of aggravated assault by using or exhibiting a "deadly weapon, to-wit: a firearm," committed by either "acting alone or as a party with FRANCISCO JAVIER AZUARA and JESSICA ORTEGA" to "intentionally, knowingly, and recklessly cause bodily injury" to seven victims by "discharging a firearm at or in the direction of" each victim. (CR 48-49). The elements of this offense are that Appellant intentionally or knowingly threatened another with imminent bodily injury and used or exhibited a deadly weapon during the commission of the assault. TEX. PENAL CODE § 22.01(a)(2); *Wilson v. State*, 391 S.W.3d 131, 135 (Tex. App.—Texarkana 2012).

The jury charge also authorized the jury to convict the Appellant under the law of parties. (12 RR 15). The jury charge stated that the a person is "criminally responsible as a **party** to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id*. (emphasis added); TEX. PENAL

- 56 -

CODE § 7.01(a); *see Hinojosa*, 433 S.W.3d at 752. The application paragraphs for each count, as applied to Appellant, stated:

> Now if you find from the evidence beyond a reasonable doubt that on or about the 7th day of July 2013 in Webb County, Texas, the defendant, Alfonso Carlos Tamez, as a party by aiding, did then and there intentionally, knowingly, or recklessly cause bodily injury to Jose Luis Ortiz, and did then and there use or exhibit a deadly weapon, to wit a firearm, during the commission of said assault, you will find the defendant guilty of aggravated assault with a deadly weapon as charged in the indictment.

(12 RR 16-20). Due to a request by Appellant, the application paragraphs limited the mode of liability to "as a party by aiding." (12 RR 8-9). However, because "party" liability was defined by the charge as including both principal and party liability—that the Appellant is guilty of an offense "committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both"—the application paragraphs authorized the jury to convict if they found that Appellant either directly committed the charged act of shooting the victims with a firearm, or if they found that he aided the commission of the offense by someone else that he aided to commit the offense. (*Id.*).[8]  Hence, the elements could also be met if the Appellant had the intent to promote or

---

[8] For purposes of legal sufficiency of the evidence, the "the elements of the offense [are taken as they are] defined by a hypothetically correct jury charge." *Hinojosa*, 433 S.W.3d at 752-53 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App.1997)). Hence, the given jury charge does not factor into the sufficiency-of-the-evidence question.

assist the commission of the offense by aiding Azuara or Ortega to shoot the victims. *See Hinojosa*, 433 S.W.3d at 752-53 (citing TEX. PENAL CODE § 7.01(a)).

In determining if Appellant was a party to the offense by aiding Azuara or Ortega, the jury could consider events that occurred before, during or after the offense, and could rely on acts that show an understanding and common design to infer the Appellant's guilt. *De la Fuente v. State*, 432 S.W.3d 415, 423 (Tex. App. San Antonio 2014); *see Hinojosa*, 433 S.W.3d at 752. The jury could rationally find Appellant guilty as a party if he was present in an accomplice's company before, during, or after the commission of the offense, but only if that presence was coupled with other suspicious circumstances tending to connect him to the offense. *Hinojosa*, 433 S.W.3d at 755. Therefore, Appellant's legal-sufficiency challenge boils down to a question of whether there was sufficient evidence of such circumstances such that a rational juror could, without reasonable doubt, either identify him as the shooter or conclude that he had an agreement with Azuara or Ortega to act together in a common design to assault the nightclub. *See de la Fuente*, 432 S.W.3d at 423.

## C. Application: Principal Liability

Despite the Appellant's bald claim that "no witness testified that Tamez was in fact the shooter[,]" (Ant. Brief at p. 18), he was in fact directly identified as the shooter by Jonathan Santos in his statement to the police: "I just saw in the club, D.J.'s, I saw a fight in the D.J.'s Republic and went outside and I hear the shots and Pelón, [Appellant] Tamez, shot me in the left knee, and I saw him with the gun. And he went to the truck -- into the white truck, the Hummer, and left." (11 RR 168). Although the witness expressed some doubt about the identification, that is not enough to absolve the Appellant from principal liability, because the jury has discretion to resolve any conflicts in his testimony against the Appellant. *De la Fuente*, 432 S.W.3d at 423 (citing *Brooks*, 323 S.W.3d at 899).

While Angel Cruz-Avitu identified Azuara as the gunman, (11 RR 77-78), and there was other conflicting identification testimony, this alone does not make the evidence legally insufficient. *Dorsey*, 24 S.W.3d 921, 924; *see also Pedraza v. State*, No. 04-13-00238-CR, 2014 WL 7442674 (Tex. App.—San Antonio Dec. 31, 2014) (not designated for publication) (holding contradictory testimony from the same witness who identified a stolen ring did not render evidence of robbery legally insufficient). The jury was free to reconcile the conflicts in any logical way that showed

Appellant's guilt. For example, since there were two different calibers of bullets found (ergo, two guns were used), and two different statements as to who the shooter was—Angel Cruz-Avitu said it was Azuara; Jonathan Santos said it was Appellant Tamez—the jury could very well have decided that *both* Appellant *and* Azuara were gunmen. The forensic evidence could be reconciled under a scenario that Azuara shot a 9mm gun from outside the Expedition (as stated by Cruz-Avitu) and that Appellant shot a .380 gun from inside the Hummer (as stated by Leonel Perez). (10 RR 153-54). And the jury's task of fingering the Appellant was made easier by the other suspicious circumstances linking Appellant to the crime described below.

### D. Application: Party Liability

Despite the darkness and chaos of the crime scene, all but one of the eyewitnesses saw a white SUV in the area from which the shots were fired, and which sped away after the shooting. Osmond Castillo, and Jose Arturo Garcia saw the dark-colored Expedition alongside this white SUV which left along with it, (11 RR 19); (11 RR 64-65), and multiple witnesses confirmed that the white SUV was Appellant's Hummer. (10 RR 239). (10 RR 154). Leonel Perez saw the gunshots come from inside the Hummer: " I just saw the [ ] hand with a white shirt on and shooting towards us [from

the] … front window, the passenger's side…. I just saw the hand shoot, but with a white shirt around it … holding … the gun." (10 RR 153). After stating that he thought he saw a ponytail in the driver's window, he confirmed that "it was Pelón Tamez's Hummer." (10 RR 154). Hence, there was strong evidence confirming that "Pelón [Appellant] Tamez's Hummer" was involved in the crime. Notwithstanding everyone who saw his Hummer, Appellant baldly told the police that he and the codefendants "weren't in the area at the time of the shooting." (11 RR 203). He also expressed both expertise about gunshot residue and an eagerness to have the police test his Hummer for residue, which the police correctly took (along with Azuara's statements about "we cleaned up") as evidence that Appellant had purged the Hummer of gunshot residue. (11 RR 203).

Leticia Carreon knew Appellant was involved in the shooting, and when she called him to confront him, Appellant chose to dispel that accusation by directing the posse to take him and his Hummer back to the back to the club to fabricate an alibi and shake the heat. There was also evidence that Appellant's girlfriend had tried to get Jonathan Santos to retract his identification of Appellant as the gunman. (11 RR 168, 227-28). All of that, plus Appellant's own his false statement to the police, are evidence of his consciousness of guilt. *King*, 29 S.W.3d at 564–65. Hence,

Appellant, like the defendant in *De la Fuente*, was more than just the driver of the hit-getaway vehicle. *Cf. De la Fuente*, 432 S.W.3d at 417-18. There was copious evidence of his (and his Hummer's) participation in a common plan or design with the other codefendants to commit aggravated assault upon the nightclub's patrons. *Cf. De la Fuente*, 432 S.W.3d at 417-18.

As such, the State respectfully requests that Appellant's second issue, concerning sufficiency of the evidence, be overruled.

**RESPONSE TO POINT OF ERROR NO. 3 (Jury Charge Error):**

**Whether the trial court erred in instructing the jury on the law of parties by not naming the principal actor, not stating the actions committed by Appellant that aided the commission of the alleged crime, or not pointing the jury to a part of the charge that did so state?[9]**

## SUMMARY OF THE ARGUMENT

Statements of fact do not belong in jury charges, and Appellant's lead case does not hold that he was entitled to have those statements included in the charge. Appellant's primary complaint about the charge, that the principal actor was not identified in the application paragraph, was rejected by this Court in *Gordon v. State*.[10] Even if Appellant was somehow entitled to inclusion of the name of the principal actor and the specific action Appellant performed to aid in the commission of the offense, the omission of those instructions was not harmful.

---

[9] Although counsel for the State anticipated that Appellant would mount a broader challenge to the jury charge since he had amended his brief, this does not appear to be the case; the argument is essentially the same as in codefendant Azuara's brief. Hence, this response is almost identical to that in the State's brief in Azuara's case.

[10] 714 S.W.2d 76, 77 (Tex. App.—San Antonio 1986, no pet.)

## ARGUMENT AND AUTHORITY

### A. Rule: Jury Charges Do Not Contain Statements of Fact

Assuming that Appellant has preserved error about the jury charge,[11] the first point is that the purpose of a jury charge is to state the law applicable to the facts in the case. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see* TEX. CODE CRIM. PROC. art. 36.14 ("the judge shall … deliver to the jury … a written charge … not expressing any opinion as to the weight of the evidence, not summing up the testimony, [nor] discussing the facts…."). There "is no better established rule than [this]: '[it] is not proper for the court to single out particular facts or specific parts of the testimony and charge thereon. To do so would be instructing on the weight of the evidence.'" *Dunne v. State*, 263 S.W. 608, 616 (Tex. Crim. App. 1923); *see Mendoza v. State*, 88 S.W.3d 236, 238 (Tex. Crim. App. 2002) (citing *Mendoza v. State*, 61 S.W.3d 498, 505

---

[11] It appears that the objection now being raised by Appellant was actually made by Joaquin Amaya, counsel for acquitted codefendant Jessie Ortega. (12 RR 11-12). On the other hand, Appellant's counsel stated immediately thereafter that he had *no objections* to the charge as it was printed. *Id.* Generally, an appellant can raise unobjected-to jury charge error but must show egregious harm to obtain reversal. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). However, there is an exception for *invited* jury-charge error, which is nevertheless waived—and it appears that this error was indeed at least somewhat invited. *See* discussion *infra* subpart C.

(Tex. App.—San Antonio 2001)). Put simply, jury charges are not supposed to contain statements of fact.

The Appellant cites to *Vasquez v. State*, 389 S.W.3d 361 (Tex. Crim. App. 2012),[12] for a notion that the charge was allegedly erroneous because it did not include certain statements of fact; the Appellant wanted the jury charge to say that the Appellant should be found guilty as a party only if, for example, he aided Azuara to commit the offense by doing certain things like shooting a gun or loaning the Hummer.

However, *Vasquez* did not hold that such facts must be included in a jury charge on the law of parties, even if requested. That would require an overruling of Article 36.14's prohibition on statements of fact in jury charges, and there is nothing in *Vasquez* suggesting that is what the Court of Criminal Appeals meant to do. Rather, *Vasquez* held that "if the defendant does request that the application paragraph refer only to those specific party-liability acts that are supported by the evidence, then he is entitled to such a narrowing." *Vasquez*, 389 S.W.3d at 367. *Vasquez* refers only to a "failure to narrow the specific **modes** of party-liability conduct [which] when properly requested is reversible error if the defendant has suffered actual harm to his rights." *Vasquez*, 389 S.W.3d at 367-68

---

[12] Appellant also cites to *Plata v. State*, 926 S.W.2d 300 (Tex. Crim. App. 1996), which is inapposite because it dealt with the exclusion of a whole application paragraph.

(emphasis added). The "modes" of party liability are not the specific *facts* giving rise to party liability. TEX. CODE CRIM. PROC. art. 36.14. Rather, they are the specific *acts* named in section 7.02 of the Penal Code by which a person can commit a crime as a party, such as by aiding, directing, and encouraging the commission of the crime. *Vasquez*, 389 S.W.3d at 367-68; *Washington v. State*, 449 S.W.3d 555 (Tex. App.—Fort Worth 2005). The holding in *Vasquez* is that if a defendant requests that certain modes of party liability be deleted because they are not supported by any evidence, he is entitled to such deletions. *Id.*; *Vasquez*, 389 S.W.3d at 368. It does not require the State, for example, to name the principal actor in the jury charge, as Appellant claims. *Gordon v. State*, 714 S.W.2d 76, 77 (Tex. App.—San Antonio 1986, no pet.). The "only relevant inquiry for the jury was whether others committed the offense charged in each case and appellant was criminally responsible for their action." *Id*.

## B. Application: Appellant Improperly Wanted Facts in the Charge

Accordingly, the defense counsel asked for *and obtained* modifications to the jury charge that narrowed the party-liability mode language to only "aiding" in the commission of the offense. (12 RR 6-7). The objection being revived here is that the charge was not narrowed sufficiently enough *to reflect the facts* that were testified to in the case. In

other words, Appellant wanted the jury charge to say *how* the State alleged that he aided the commission of the offense. It is error for a jury charge to contain such a statement of facts. TEX. CODE CRIM. PROC. art. 36.14. Accordingly, the trial judge was correct to overrule counsel's final objection.

## C. Arguendo Harm Analysis

Assuming arguendo that the charge should have contained a statement of facts establishing party liability, the conviction need not be reversed unless it harmed the Appellant, taking into account the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole. *Vasquez*, 389 S.W.3d at 369 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)).

### 1. The Nature of the (Invited) Jury Charge Error

The first *Almanza* factor is the nature of the error in the jury charge, taken in consideration of the charge as a whole. *Almanza*, 686 S.W.2d at

171. The "error" posited by the Appellant here—that the jury charge did not comment on the facts—is not an error. *See* discussion *supra* subpart A.

But since this *Almanza* factor encompasses the whole charge, including any other errors therein, it should be pointed out that the jury charge's application paragraphs were arguably unclear as to *principal* liability, because the only mode of liability stated was "as a **party** by aiding[.]" (12 RR 21-23) (emphasis added). Most jury charges alleging both principal and party liability will contain language in the application paragraph such as 'either **acting alone or** as a party by [mode of party liability, e.g., aiding].' This charge lacked the bolded language. The Appellant could have (but has not) argued that this omission aggravates the alleged charge errors (which this section assumes are truly errors for purpose of the harm analysis). However, that is at least arguably the Appellant's fault, because he is the one who asked for the charge's application paragraphs to state the same mode of party liability as to all three codefendants. (12 RR 4-6); (12 RR 9-10).

Counsel insisted on expanding this objection to all three codefendants, and *repeatedly demanded that the application language be the same for all of them*. And he got what he asked for: a situation in which

*none* of them was named in the application paragraphs as 'acting alone.' An appellant cannot create error at trial and then cash it in at the court of appeals to get a remand. *Druery v. State*, 225 S.W.3d 491, 505–06 (Tex. Crim. App. 2007). Therefore, notwithstanding the duty of the trial judge to charge on the law applicable to the case, a defendant who asks the court for an incorrect charge, and obtains it, cannot complain about the error on appeal. *Prystash v. State*, 3 S.W.3d 522, 431 (Tex. Crim. App. 1999). Thus, this issue about the jury charge describing all three codefendants' liability as being limited to "as a party by aiding," is a creation of the Appellant which has no relevance to the *Almanza* harm analysis. *See id.*

Even if this issue with the charge was not invited, it does not rise to the level of a harmful error. The charge's application section lacked the "acting alone" language, but it did include liability "as a party," which was defined in the abstract portion of the jury charge. Tracking the language of Penal Code section 7.01, the abstract definition of criminal responsibility stated that a "person is criminally responsible **as a party** to an offense if the offense is committed **by his own conduct,** by the conduct of another for which he is criminally responsible, or by both." (12 RR 15) (emphasis added). TEX. PENAL CODE § 7.01. Since the jury charge allowed the Appellant to be convicted if he was criminally responsible as a "party,"

and "party" liability was in turn defined as including "his own conduct," the omission of the 'acting alone' language did not prevent the Appellant from being convicted if he aided the offense *by his own conduct*. A party is still a party; the distinction between principals and accessories/accomplices has long since been abolished. TEX. PENAL CODE § 7.01(c). Nor was there any requirement that somebody be assigned as the principal actor in the jury charge. *Gordon*, 714 S.W.2d at 77. Simply put, the "party" language in this charge authorized the jury to convict the Appellant if he aided the commission of the offense in *any* capacity: whether as a principal "party" who aided the offense by pulling the trigger, or as an accessory "party" who aided the offense by merely driving the Hummer or destroying the GSR evidence. *Cf. Marvis v. State*, 36 S.W.3d 878, 880 (Tex. Crim. App. 2001). If the jury found that Appellant aided the offense, he was a party thereto, and the jury was accordingly authorized to convict him regardless of *how* he aided the offense's commission, or *who* he ultimately aided to commit the offense.

## 2. The State of the Evidence

Moving on to the next *Almanza* factor, the evidence at trial, Appellant was indicated as the shooter by at least one witness, Jonathan

Santos, in his police statement. Appellant's Hummer's involvement in the shooting was also established by copious witness testimony. Appellant further gave a false statement to the police to create an alibi while alluding to destruction of the gunshot residue in the Hummer. (11 RR 207). As such, a reasonable jury would understand that this is what the charge meant by "aiding"—Appellant aided the offense either as a principal by pulling the trigger, or as a party by driving the Hummer or covering up the GSR evidence. *Cf. Vasquez*, 389 S.W.3d at 371 (where the evidence established the party's role as getaway driver).

### 3. The Arguments of the Parties

The third *Almanza* factor is the argument of the parties, and the arguments of defense counsel demonstrate that the jury knew that Appellant was being charged with either directly committing the offense or by aiding the crime by driving the Hummer or covering up the gunshot residue, with the defense emphasizing the negative GSR results on the Hummer. (12 RR 44). The State argued both for party liability on account of aiding Tamez, (12 RR 37), and also for principal liability: that it was Appellant who did the shooting. (12 RR 32, 65-66). The defense

vociferously contested this, claiming there was "zero evidence to say that Mr. Tamez, Mr. Azuara, or Ms. Ortega shot at those people." (12 RR 59).

### 4. Summary of the Harm Analysis

The jury charge did not distort the evidence, and the record shows that the jury was presented with suitable arguments, based on articulation or contestation of the evidence, by both parties. Since the law of parties was correctly argued, the jury could not have been misled by the alleged error in the charge. *See Vasquez*, 389 S.W.3d at 372.

As such, the State respectfully requests that Appellant's third issue, concerning jury charge error, be overruled.

**RESPONSE TO POINT OF ERROR NO. 4 (Hearsay):**

**Whether the trial court abused its discretion in admitting hearsay testimony in violation of Appellant's substantial rights?[13]**

## SUMMARY OF THE ARGUMENT

The statement was an excited utterance, as evidenced by the ample testimony of the completely chaotic scene at D.J.'s Republic after the shooting. Moreover, the objected-to testimony was cumulative of other testimony admitted without objection.

## ARGUMENT AND AUTHORITY

### A. Standard of Review

The Court should review a trial court's decision to admit or exclude hearsay evidence under an abuse of discretion standard. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). In so doing, the appellate court should limit itself to determining whether the record supports the trial court's ruling. *Coffin v. State*, 885 S.W.2d 140, 149 (Tex .Crim. App. 1994). The trial judge's decision should be reversed only if it was "so clearly wrong as to lie outside the zone within which reasonable persons

---

[13] This response is likewise identical to that in the response to the third issue in Azuara's brief.

might disagree." *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992).

An excited utterance is "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." TEX. R. EVID. 803(2).[14] In determining whether a hearsay statement is admissible as an excited utterance, the court may consider the time elapsed and whether the statement was in response to a question; however, these are nondispositive factors only. *Zuliani*, 97 S.W.3d at 596. The critical determination is "whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event" or condition at the time of the statement, and the decision to admit a statement as an excited-utterance hearsay exception should not be disturbed unless "a clear abuse of discretion is shown." *Id.* at 595-96.

## B. Application

Appellant insists that the admission of a statement of Maria Santos, related though Officer Aldo Alaniz, was hearsay not within any exception. The statement in question was that Maria Santos "had seen a white SUV that committed—that fired the shots… [and that] the individuals that had

---

[14] The language of Rule 803 used here is that before the 2014 plain-language amendments.

shot at the civilians were involved in a fight inside the bar." (Ant. Brief at p. 31).

The State sought to admit this statement under the excited-utterance hearsay exception, indicating that Ms. Santos had a "frightened state" at the time she told the officer these facts. (10 RR 119). The Appellant complains that neither the State or the trial court cited that hearsay exception. However, on appeal, the trial judge's ruling admitting that statement will be sustained if it is correct under that or any other theory. *Prystash*, 3 S.W.3d at 527.

The critical determination is "whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event" or condition at the time of the statement. *Zuliani*, 97 S.W.3d at 596. That this was so is eminently clear from the unanimous testimony of the officers and eyewitnesses that D.J.'s Republic was a warzone before, during, and after the shooting. From the multiple brawls to the gunshots to the blood splattered everywhere to the triaging of the victims to the officers scrambling to find evidence, the scene was "mass chaos." (10 RR 91). The statement was taken amidst that chaos and within a few minutes of the shooting; the record accordingly supports the trial judge's ruling and no abuse of discretion is shown.

## C. Arguendo Harm Analysis

Assuming arguendo that the Appellant's statement was inadmissible, the record and Appellant's brief both indicate that the Appellant's objection was predicated on the Texas Rules of Evidence. "Error [under those Rules] may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected…." TEX. R. EVID. 103. Thus, errors predicated on the Rules of Evidence rise to constitutional magnitude "only if they 'significantly undermine fundamental elements of the accused's defense.'" *Potier v. State*, 68 S.W.3d 657, 666 (Tex. Crim. App. 2002). Generally, errors concerning the prohibition of hearsay under the Rules of Evidence do not infringe the right to present a defense, due process, or any other constitutional right. *Id.* This is true whether the alleged error is that evidence was wrongly admitted or excluded. *Lester v. State*, 120 S.W.3d 897, 902-03 (Tex. App.—Texarkana 2003). Appellant has not alleged Confrontation Clause error or otherwise alleged that he was denied a constitutional right. As such, the applicable harm standard is that for non-constitutional harm under Rule of Appellate Procedure 44.2(b). *Id.*; *Potier*, 68 S.W.3d at 666.

Any non-constitutional error is harmless unless it affected a substantial right of the Appellant, meaning that it had a substantial and injurious effect or influence on the jury's verdict. TEX. R. APP. P. 44.2(b); *Lester*, 120 S.W.3d at 903; *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). In determining whether the error affected the jury's decision, the reviewing court considers the entire record, from voir dire through closing arguments. *Lester*, 120 S.W.3d at 903. In other words, the Court should look to see what other evidence tended to show the same facts as the Appellant's statement, and if that remaining evidence was sufficient to prove the elements of the offense which the complained-of evidence also went to. *See id.* (holding a substantial right of the appellant was affected when the erroneously-admitted evidence was the only evidence of identity).

In particular, there is no harm when the complained-of testimony is cumulative of other evidence. *See Rangel v. State*, 179 S.W.3d 64, 70 (Tex. App.—San Antonio 2005, pet. ref'd) (holding there is no harm when complained-of evidence was admitted through other testimony). Here, Officer Alaniz's recital of Maria Santos's statement that "she had seen a white SUV that committed—that fired the shots" was cumulative of Leonel Perez's testimony that the white Hummer was the source of the

gunfire. (10 RR 153-54). Further, Jonathan Santos and several other witnesses provided evidence of Appellant's identity as the principal or as a party to the crimes. As such, the Appellant cannot show harm of any kind, even if that statement should not have been admitted.

As such, the State respectfully requests that Appellant's fourth issue, concerning hearsay, be overruled.

## PRAYER

For the reasons stated above, the State prays that the Appellant's conviction be AFFIRMED.

Respectfully submitted,

ISIDRO R. ALANIZ
DISTRICT ATTORNEY
49TH JUDICIAL DISTRICT

By:___/s/_____
David L. Reuthinger, Jr.
Assistant District Attorney for
THE STATE OF TEXAS
Webb County, 49th Judicial District
1110 Victoria St., Suite 401
Laredo, Texas 78040
(956) 523-4900
(956) 523-5070 (Fax)
Bar No. 24053936
**ATTORNEY FOR APPELLEE**

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Rule 9.4, Texas Rules of Appellate Procedure, as amended, and that the word count, less exempt sections, is 14,982.

Date: 3/9/15

\_\_\_/s/_____
David L. Reuthinger, Jr.
Attorney for Appellee

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Appellee's Brief has been delivered to Nathan Henry Chu, attorney for the Appellant, via either TexFile e-Service or fax to (956) 568-0052.

Date: 3/9/15

\_\_\_/s/_____
David L. Reuthinger, Jr.
Attorney for Appellee